Richard L. Wynne (Bar No. 120349)
richard.wynne@hoganlovells.com
Erin N. Brady (Bar No. 215038)
erin.brady@hoganlovells.com
Edward J. McNeilly (Bar No. 314588)
edward.mcneilly@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

Megan Nishikawa (Bar No. 271670)
megan.nishikawa@hoganlovells.com
HOGAN LOVELLS US LLP
4 Embarcadero Ctr., Ste 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499

Attorneys for Plaintiff, KS Mattson Partners, LP

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SANTA ROSA DIVISION

| | |
|---|---|
| In re<br><br>LEFEVER MATTSON, a California corporation, et al.<br><br>Debtors.[1] | Case No. 24-10545 CN (Lead Case)<br><br>(Jointly Administered)<br><br>Chapter 11 |
| In re<br><br>KS MATTSON PARTNERS, LP,<br><br>Debtor. | Adv. Pro. No. 25-_____<br><br>**COMPLAINT FOR TURNOVER** |
| KS MATTSON PARTNERS, LP,<br><br>Plaintiff<br><br>v.<br><br>KENNETH W. MATTSON, an individual; STACY MATTSON, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | |

---

[1] The last four digits of LeFever Mattson's tax identification number are 7537. The last four digits of the tax identification number for KS Mattson Partners, LP are 5060, and its address for service is c/o Stapleton Group, 514 Via de la Valle, Solana Beach, CA 92075. The address for service on LeFever Mattson and all other Debtors is 6359 Auburn Blvd., Suite B, Citrus Heights, CA 95621. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://veritaglobal.net/LM.

1

As and for its complaint, plaintiff, KS Mattson Partners, LP ("**KSMP**" or "**Plaintiff**"), by and through undersigned counsel, and based upon knowledge, information, belief, and its investigation to date, alleges as follows:

## I. PRELIMINARY STATEMENT

1. Section 542(a) of the Bankruptcy Code imposes a clear mandate: any individual or entity in possession of property that a debtor in possession may use, sell, or lease under section 363 "shall deliver" that property to the estate if it is not of inconsequential value. Estate assets are to be recovered and administered for the benefit of creditors.

2. This action seeks to enforce that mandate. It is a straightforward turnover action seeking possession of a 6,000-square-foot luxury residence owned by the estate (the "**Property**") and currently occupied by Defendants Kenneth W. and Stacy Mattson (together with DOES 1 through 20, inclusive, "**Defendants**"). What makes this case striking is not the relief it seeks, but the stark disparity it presents. Creditors of this bankruptcy— many of them retirees and victims of Mr. Mattson's extensive alleged fraud—lost retirement savings and decades of accumulated financial security, with some left to survive on only the "bare necessities."[1] Meanwhile, Mr. Mattson—the individual accused of orchestrating the fraud—and his spouse continue to occupy the estate's multi-million-dollar Property, have refused repeated requests to relinquish possession or compensate for its use, and have repeatedly resisted Plaintiff's efforts to recover possession, thereby blocking the estate's ability to monetize the Property for the benefit of those same creditors.

3. The human impact of Mr. Mattson's alleged fraud—and the importance to creditors of reclaiming and monetizing the Property—is reflected in the record of the related criminal proceedings. At Mr. Mattson's May 28, 2025 detention hearing, victims described the harsh financial consequences they now face. One explained that "many victims are now living with just the bare necessities, while Mr. Mattson and his family continue to live in luxury." (Hr'g. Tr. at 39:25–40:3.) Another shared: "My wife and I are struggling. We had to rent our own house out in

---

[1] *United States of America v. Kenneth W. Mattson*, Case No. 25-cr-00126-CRB-1, Hr'g Tr. May 28, 2025, at 39:25–40:3 (N.D. Cal.) (hereinafter "**Hr'g Tr.**"). A true and correct excerpt of the May 28, 2025 hearing transcript (with the victim statements quoted in this complaint highlighted in yellow) is attached as **Exhibit A**.

2

order to pay our way through life and live at a lower cost of living area." (*Id.* at 44:18-22). And a third stated bluntly: "I'm a member of the local food bank, so I can eat." (*Id.* at 48:24–25).

4. Plaintiff is acutely aware of the disparity created by Mr. Mattson's continued occupancy of the Property and has for months attempted to address it. Shortly after the appointment of its Responsible Individual, and upon confirming that Defendants were in possession of the Property, Plaintiff sought clarity regarding their intentions—whether Defendants intended to remain, or instead relocate to Mr. Mattson's vacant, multi-million-dollar Piedmont residence so that the Property could be sold for the benefit of creditors. Defendants made clear they wanted to remain. They cited their desire to attend a local church and Bible study—Defendants' counsel asserted they are "very religious"—and complained of a "nasty" creditor who lived across the street from the Piedmont residence. Defendants ultimately declined to enter into any market-based occupancy arrangement, electing instead to continue occupying the Property without providing compensation to the estate for its use.

5. At that stage, Plaintiff could not immediately seek turnover or pursue state-law remedies—not for lack of diligence or resolve, but because the automatic stay in Mr. Mattson's involuntary bankruptcy case constrained its ability to do so. Rather than reflexively incur the legal expense and delay afforded by seeking relief from stay, Plaintiff first attempted to resolve the matter consensually and proposed a negotiated move-out to Defendants. That effort proved unsuccessful. Defendants failed to meaningfully engage, leaving Plaintiff with no practical alternative but to incur the time and expense necessary to obtain relief from stay so it could proceed under applicable law.

6. Upon obtaining relief from stay—and thus the clear ability to pursue formal remedies—Plaintiff again did not reflexively resort to litigation. Instead, consistent with its fiduciary obligations to preserve estate resources and maximize value, Plaintiff first pursued measured, commercially reasonable steps designed to secure Defendants' voluntary relinquishment of possession and position the estate to proceed efficiently under applicable law, while avoiding unnecessary administrative expense. Among other things, Plaintiff implemented market-based occupancy terms consistent with applicable California law, explored a consensual move-out, and

3

ultimately terminated Defendants' permissive occupancy effective April 4, 2026. None of these measured efforts produced voluntary compliance. At nearly every juncture, Defendants chose resistance over resolution—conduct that continues to impose avoidable costs on the estate and delay recoveries for Mr. Mattson's defrauded investors.

7. Defendants' continued refusal to relinquish possession has left one of the estate's most valuable assets occupied and unable to be monetized. Each additional month Defendants remain in possession without compensating the estate—and thereby prevent the Property from being marketed—delays distributions and further reduces the funds available for creditor recovery. The Bankruptcy Code does not permit estate property to be commandeered for personal residential use at creditors' expense. Continued occupation under these circumstances serves only to delay liquidation and prolong the very harm this bankruptcy case exists to remedy.

8. Accordingly, this action seeks to enforce the Bankruptcy Code's mandate and recover possession of the Property, so that it may finally be administered for the benefit of creditors.

## II. JURISDICTION AND VENUE

9. The United States Bankruptcy Court for the Northern District of California, Santa Rosa Division (the "**Court**" or "**Bankruptcy Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § § 157 and 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) and (O).

10. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

11. This adversary proceeding is commenced pursuant to Rule 7001(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and section 542 of title 11 of the United States Code (the "**Bankruptcy Code**").

12. Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court.

## III. THE PARTIES

13. Plaintiff is a California limited partnership and a debtor and debtor in possession in the chapter 11 case captioned *In re KS Mattson, LP*, Case No. 24-10715, pending in this Court. Plaintiff's case is jointly administered under *In re LeFever Mattson, a California Corporation*,

4

Lead Case No. 24-10545. Plaintiff was formed on August 16, 1999, and its partnership interests are held by Kenneth W. Mattson (49%), Stacy Mattson (49%), and K S Mattson Company, LLC (2%).

14. Defendant Kenneth W. Mattson is an individual who resides at 3003 Castle Road, Sonoma, California, 95476. Mr. Mattson is currently under criminal indictment in the United States District Court for the Northern District of California on nine felony charges (seven counts of wire fraud, one count of money laundering, and one count of obstruction of justice). He is also a debtor in the chapter 7 case captioned *In re Kenneth W. Mattson*, Case No. 24-10714, currently pending in this Court. Mr. Mattson is an "insider" of Plaintiff within the meaning of section 101(31) of the Bankruptcy Code.

15. Defendant, Stacy Mattson, is an individual who, together with Mr. Mattson, resides at the Property. Stacy Mattson is married to Mr. Mattson and is an "insider" of Plaintiff within the meaning of section 101(31) of the Bankruptcy Code.

16. Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants designated herein as DOES 1 through 20, inclusive, is in possession of the Property or claims an interest therein adverse to Plaintiff's right to possession. Plaintiff does not presently know the true names or capacities of these Defendants and therefore sues them by fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

### IV. STATEMENT OF FACTS
### RELEVANT TO THE CLAIM FOR RELIEF

#### A. General Procedural Background

17. Both Plaintiff's and Mr. Mattson's bankruptcy cases arise from an alleged multi-year, multi-million-dollar fraud perpetrated by Mr. Mattson. His alleged scheme has spawned multiple prepetition actions against Plaintiff, Mr. Mattson, and LeFever Mattson, a California Corporation (a real estate corporation jointly owned by Mr. Mattson and Timothy LeFever), as well as federal criminal charges.

5

18. On November 22, 2024, involuntary petitions for relief under chapter 11 of the Bankruptcy Code were filed against both Plaintiff (which was then under the control of Mr. Mattson) and Mr. Mattson.

19. On June 9, 2025, this Court entered the order for relief in Plaintiff's chapter 11 case. Robbin L. Itkin was subsequently appointed as Plaintiff's Responsible Individual, effective June 16, 2025 [Case No. 24-10715, Dkt. Nos. 131, 172]. Since Ms. Itkin's appointment, neither Mr. Mattson nor anyone associated with him has exercised control over Plaintiff.

20. On September 5, 2025, this Court entered the order for relief in Mr. Mattson's chapter 11 case [Dkt. No. 127]. On September 22, 2025, the Bankruptcy Court converted the case to one under chapter 7 of the Bankruptcy Code [Dkt. No. 147]. The Office of the United States Trustee appointed Janina M. Hoskins as chapter 7 trustee on September 24, 2025, [Dkt. No. 154].

**B.     Plaintiff Owns the Property**

21. Plaintiff is the legal and equitable owner of the Property, which is located at 3003 Castle Road, Sonoma, California. Plaintiff acquired the Property in or about August 2021 for approximately $6.5 million. Title to the Property remains vested in Plaintiff. A true and correct copy of the Title Report for the Property is attached as **Exhibit B**.

22. The Property is a luxury residence of approximately 6,000 square feet situated on approximately 50 acres in Sonoma County.



6



Source: https://www.realtor.com/realestateandhomes-detail/3003-Castle-Rd_Sonoma_CA_95476_M25532-48661.[2]

23. Plaintiff currently anticipates listing the Property for sale at not less than $6.85 million. Based on comparative market rental analysis, the fair market rental value of the Property is not less than $20,000 per month.

**C. Defendants Remain in Possession of the Property Without Any Right to Do So.**

24. Defendants currently reside at the Property. They have been in possession since at least the Relief Date and, to the best of Plaintiff's knowledge, information and belief, have remained in continuous possession since that time.

25. There is no written, oral, or court-approved agreement authorizing Defendants' possession of the Property without compensation or in exchange for services. Defendants have produced no such document, and Plaintiff's books and records reflect none.

26. Since at least the appointment of the Responsible Individual on June 16, 2025, Defendants have provided no payment or other consideration authorized or accepted by Plaintiff

---

[2] Plaintiff accessed these photos on November 24, 2025 in preparation for Plaintiff's *Motion of KS Mattson Partners, LP for Relief from Automatic Stay*, Case No. 24-10714, Dkt. No. 186. They were attached to the supporting Declaration of Savannah Wellander [Dkt No. 188]. Notably, these photographs are no longer accessible on the website of realtor.com or any other major real estate listing website.

7

for their continued possession of the Property.

**D.** **Plaintiff Attempts to Resolve Defendants' Occupancy Without Litigation Before Seeking Relief from the Automatic Stay.**

27. On August 22, 2025, shortly after the Responsible Individual's appointment, Plaintiff, through its bankruptcy counsel, sent a letter to Defendant Kenneth W. Mattson's criminal counsel addressing several matters, including Defendants' occupancy of the Property. The letter noted the absence of any lease and requested clarification of Defendants' intentions regarding their continued possession. The correspondence was intended solely to obtain clarity regarding Defendants' occupancy and did not constitute recognition of any tenancy or possessory right. A true and correct copy of that correspondence (which redacts the portions of the letter that are not related to the Property) is attached as **Exhibit C**.

28. On September 9, 2025, following further discussions between counsel—including discussion of Defendants' potential relocation to a residence in Piedmont owned by Mr. Mattson (and held by his bankruptcy estate)—Defendant's criminal counsel sent an email to Plaintiff's bankruptcy counsel raising concerns about relocating to the Piedmont residence, stating:

> There is a nasty investor across the street from them in Piedmont.
> Also, their church and bible study group are in Sonoma—they are
> very religious.

A true and correct copy of the September 9, 2025 correspondence is attached as **Exhibit D.**

29. On September 19, 2025, during an in-person meeting between counsel, Plaintiff's counsel proposed a move-out arrangement that would permit Defendants to remain in the Property for a defined transition period, without charge, to facilitate Defendants' orderly relocation so the Property could be marketed for sale (an approach aligned with the best interests of creditors, as it would avoid the delay and expense associated with formal legal proceedings). Defendants did not accept that proposal.

**E.** **Plaintiff Obtains Relief from Stay to Recover Possession.**

8

30. In light of these unsuccessful efforts, and in order to pursue available remedies to recover possession, on November 25, 2025, KSMP filed the *Motion of KS Mattson Partners, LP for Relief from Automatic Stay* [Case No. 24-10714, Dkt. No. 186].

31. On December 15, 2025, the Bankruptcy Court entered the *Order Granting Motion of KS Mattson Partners, LP Relief from Automatic Stay* [Case No. 24-10714, Dkt. No. 203] (the "**Stay Relief Order**"). Paragraph 2 of the Stay Relief Order provides that:

> KSMP is hereby granted relief from the automatic stay to pursue, at its discretion, all remedies available under applicable law ***to regain possession of the property located at 3003 Castle Road, Sonoma, California 95476 from Kenneth W. Mattson, and to take any steps necessary to effectuate that recovery***. Such steps may include, without limitation, serving notices and papers required under California real estate law, delivering a new lease, ***filing a turnover action in this Court, filing an unlawful detainer action in California state court, and taking related enforcement measures***.

Stay Relief Order ¶ 2 (emphasis added). A true and correct copy of the Stay Relief Order is attached as **Exhibit E**.

32. This action, as it pertains to Mr. Mattson, is expressly authorized by the Stay Relief Order.

**F. Plaintiff Clarifies the Terms of Defendants' Continued Occupancy and Preserves Its Rights Under Applicable Law.**

33. Following entry of the Stay Relief Order, and with the stay no longer constraining enforcement, Plaintiff undertook a series of measured steps aimed at securing Defendants' voluntary compliance while minimizing further expense and preserving its rights under applicable state law. These steps were undertaken to preserve Plaintiff's state law remedies and are independent of the federal turnover relief sought in this action.

34. As an initial step—and to establish the terms of Defendants' continued occupancy under California law—Plaintiff caused Defendants to be served on or about December 20, 2025 with a written Notice of Change in Terms of Tenancy pursuant to California Civil Code § 827 (the "**Tenancy Notice**"), together with a standard written residential month-to-month Rental Agreement. The Tenancy Notice, together with the Rental Agreement, established the terms of a month-to-month tenancy and set monthly rent at $20,000—an amount derived from a market rental

9

analysis performed by two of Plaintiff's court-appointed brokers—effective January 20, 2026. True and correct copies of the Tenancy Notice and Rental Agreement are attached as **Exhibit F**.

35. Defendants remained in possession of the Property after service of the Tenancy Notice and Rental Agreement without complying with Rental Agreement's terms.

36. Thereafter, on or about January 24, 2026, after the amounts due under the Tenancy Notice remained unpaid, Plaintiff—consistent with its efforts to preserve all available remedies—caused Defendants to be served with a written Three-Day Notice to Pay Rent or Quit pursuant to California Code of Civil Procedure § 1161(2) (the "**Three-Day Notice**"). A true and correct copy of the Three-Day Notice is attached as **Exhibit G**.

37. Defendants neither cured the default nor surrendered possession of the Property.

**G.** **Defendants Refuse to Vacate and Assert Unsupported Claims.**

38. On January 29, 2026, in response to the Three-Day Notice, counsel for Defendants sent a letter to Plaintiff's property manager and counsel advancing a series of newly minted and unsupported assertions (the "**January 29 Letter**"). A true and correct copy of the January 29 Letter is attached as **Exhibit H**.

39. In that letter, Defendants conveniently asserted—for the first time—the existence of a purported long-standing "caretaker arrangement" (apparently between Defendants in their personal capacities and the entity they previously controlled) under which they claim to provide "full-time maintenance and fire mitigation services" allegedly worth $80,000 per year—the same amount allegedly paid to a "paid caretaker" they claim to have "replaced" in 2023—in exchange for the right to occupy the Property. Defendants further asserted that the "bankruptcy trustee" (presumably intended to refer to the Responsible Individual) knew of and acquiesced in this arrangement. Ex. H at 1.

40. These assertions are wholly unsupported. As alleged above, Plaintiff's books and records reflect no lease, license, or caretaker agreement authorizing Defendants' occupancy without payment, and Defendants have produced no such document. Nor has any such arrangement been approved by the Court or acknowledged or "acquiesced in" by Plaintiff or the Responsible

10

Individual. Indeed, consistent with the absence of any such arrangement, Plaintiff began raising the issue of Defendants' occupancy shortly after the Responsible Individual's appointment.

41. The January 29 Letter further asserted that:

> The Bankruptcy Court previously *declined to authorize the [Defendants'] removal* and *directed that any effort to recover possession proceed, if at all, through ordinary state law unlawful detainer procedures*. Attempts to manufacture a default through defective notices expose the estate and its agents to unnecessary litigation risk, expense, and potential sanctions.

Ex. H at 2 (emphasis added).

42. The plain language of the Stay Relief Order directly contradicts this assertion. The Bankruptcy Court neither declined to authorize Plaintiff to recover possession of the Property nor directed that any such effort proceed exclusively through state law unlawful detainer procedures. To the contrary, the Bankruptcy Court expressly authorized Plaintiff to pursue all available remedies under applicable law, including commencement of this turnover action. *See* Stay Relief Order at ¶ 2 ("KSMP is hereby granted relief from the automatic stay to pursue . . . all remedies available under applicable law . . . [including] delivering a new lease, *filing a turnover action in this Court*, filing an unlawful detainer action in California state court, and taking related enforcement measures.") (emphasis added).

**H.      Plaintiff Terminates the Tenancy and Makes Final Efforts to Resolve the Matter.**

43. On February 2, 2026, consistent with its efforts to secure Defendants' voluntary compliance while minimizing further expense and preserving its rights under applicable state law, Plaintiff caused to be served on Defendants a written 60-Day Notice of Termination of Tenancy pursuant to California Civil Code § 1946.1(b) (the "**Termination Notice**"), terminating Defendants' month-to-month tenancy effective April 4, 2026. A true and correct copy of the Termination Notice is attached as **Exhibit I**.

44. In addition to serving the Termination Notice, Plaintiff, through counsel, again proposed a consensual arrangement that would permit Defendants to remain in the Property for a

11

limited transition period to facilitate Defendants' orderly relocation and Plaintiff's ultimate sale of the Property.

45.     Defendants responded with a counterproposal, which Plaintiff considered and countered in good faith. Defendants never responded to Plaintiff's counterproposal and failed to agree to any arrangement that would provide for compensation to the estate, the ability to show the Property to potential buyers, or a definitive date for surrender of possession.

**I.     Defendants Continued Occupancy Harms the Estate**

46.     Defendants have remained in possession of the Property over Plaintiff's objection and without providing compensation to the estate, and Plaintiff has lawfully terminated any purported right Defendants may have had to continued occupancy.

47.     Defendants' continued occupancy of the Property materially impairs Plaintiff's ability to sell, lease, or otherwise monetize the Property under section 363 of the Bankruptcy Code. As long as Defendants remain in possession, Plaintiff cannot effectively market the Property to prospective purchasers (or tenants) or deliver possession at closing. Defendants' continued occupancy therefore prevents Plaintiff from realizing the Property's substantial value for the benefit of the estate and its creditors, including the victims of Mr. Mattson's fraudulent scheme.

48.     The Property is property of the estate within the meaning of 11 U.S.C. § 541 and is of substantial value to the estate. Defendants remain in possession but lack any enforceable right to continued occupancy superior to Plaintiff's rights as debtor in possession. Turnover is therefore required under 11 U.S.C. § 542(a).

**FIRST CLAIM FOR RELIEF**
**(Turnover As to All Defendants Under Bankruptcy Code § 542(a))[3]**

49.     Plaintiff repeats and realleges all the preceding paragraphs as though fully set forth herein.

50.     Section 542(a) of the Bankruptcy Code provides, in relevant part, that an entity in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease

---

[3] Plaintiff reserves the right to file a claim for unpaid rent in Kenneth Mattson's bankruptcy case.

12

under section 363 of the Bankruptcy Code shall deliver such property to the trustee (or debtor in possession) and account for such property or its value, unless such property is of inconsequential value or benefit to the estate.

51. The Property is property of the estate within the meaning of section 541 of the Bankruptcy Code.

52. Plaintiff is the legal and equitable owner of the Property and is entitled to use, sell, or lease the Property pursuant to 11 U.S.C. § 363. Title to the Property remains vested in Plaintiff.

53. Defendants are in possession, custody or control of the Property.

54. Plaintiff has terminated any purported tenancy, license, or other occupancy rights Defendants may have had, effective April 4, 2026. As of that date, Defendants will have no lease, license, rental agreement, or other agreement granting them any lawful right to continued possession of the Property, and any possessory interest they previously asserted or may have asserted will have been terminated and extinguished.

55. The Property is not of inconsequential value or benefit to the estate. Plaintiff acquired the Property for approximately $6.5 million, and the Property remains one of the estate's most valuable assets.

56. Because the Property is property of the estate, is in Defendants' possession, is of substantial value, and may be used, sold, or leased by Plaintiff under section 363, Defendants are obligated under 11 U.S.C. § 542(a) to deliver possession of the Property to Plaintiff.

57. Plaintiff is entitled to immediate turnover of the Property, and in any event no later than April 4, 2026.

**WHEREFORE, Plaintiff prays for judgment as follows**:

A. A judgment declaring that the Property is property of the estate and that Plaintiff is entitled to immediate possession of the Property pursuant to 11 U.S.C. § 542(a);

B. An order (a "**Turnover Order**") directing Defendants, and all other persons in possession of the Property, to immediately turn over and surrender possession of the Property to Plaintiff, and in any event no later than April 4, 2026;

13

C. An order authorizing the United States Marshal Service to enforce the Turnover Order and to take such actions as are necessary to deliver possession of the Property to Plaintiff, including coordinating with appropriate state or local law enforcement; and

D. Such other relief as the Bankruptcy Court may deem just and proper.

Dated: February 25, 2026

*/s/ Erin N. Brady*
Richard L. Wynne (Bar No. 120349)
richard.wynne@hoganlovells.com
Erin N. Brady (Bar No. 215038)
erin.brady@hoganlovells.com
Edward J. McNeilly (Bar No. 314588)
edward.mcneilly@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

Megan Nishikawa (Bar No. 271670)
megan.nishikawa@hoganlovells.com
HOGAN LOVELLS US LLP
4 Embarcadero Ctr., Ste 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499

*Attorneys for Plaintiff KS Mattson Partners, LP*

14

# EXHIBIT A

**In the Matter Of:**

UNITED STATES vs KENNETH W. MATTSON

3:25-cr-00126-CRB-1

**VIDEO1050406104**

*May 28, 2025*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                     US DISTRICT COURT NORTHERN

                       DISTRICT OF CALIFORNIA

                      SAN FRANCISCO DIVISION


UNITED STATES OF AMERICA, CASE NO. 3:25-cr-00126-CRB-1

     Plaintiff,

v.

KENNETH W. MATTSON,

     Defendant.


                   Transcription of Audio:

                     video1050406104.mp4


                   Date: May 28, 2025

                   Runtime: 02:29:02

               Excerpt: 00:18:06 to 02:29:02

Case: 26-01003    Doc# 1    Filed: 02/25/26    Entered: 02/25/26 20:36:54    Page 17 of
129

APPEARANCES


For the United States of America:

CHRISTOPHER LEE

NIKHIL BHAGAT

ASSISTANT UNITED STATES ATTORNEYS

450 Golden Gate Avenue, Box 36055

San Francisco, California 94102-3495


For Mr. Mattson:

RANDY SUE POLLOCK, ESQ.

LAW OFFICE OF RANDY SUE POLLOCK

286 Santa Clara Avenue

Oakland, California 94610

-and-

WILLIAM FRENTZEN, ESQ.

MORRISON FOERSTER

425 Market Street

San Francisco, California 94105-2482


Pretrial Services

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 18 of 129

MR. LEE: Yes, Your Honor.

THE COURT: Okay.

MR. LEE: We note that there are more than 50 victims present in the Courtroom.  There were over 75, approximately 75 victim statements submitted, which the Court has now in his possession, some of which were redacted on the docket, some of which were filed under seal.

There are nine victims who wish to speak.  What we would propose is to begin calling the victims up and identifying them by their first name.

THE COURT: Okay, great.  And what, what do you anticipate that they're going to do?  Are they going to read their statement into the record, or are they just going to address the Court?

MR. LEE: I think it depends on, on the victims.  The Crime Victims Rights Act is fairly broad in allowing victims an opportunity to convey to the Court the impact of the case.  I would note that the issue today is detention and whether there's a risk of flight or danger to the economic -- economic danger to the community.  I do think one thing that is striking is that in the victim impact --

THE COURT: What are these victim statements?  I'm going to allow them to speak.  But

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 19 of
129

what are they speaking to a particular prong in that, and that's why they need to go first?  Or do they just want to address the Court, which they have a right to do?  I mean, am I am I --

MR. LEE: They wish, they wish to address the Court.

THE COURT: Okay.  All right.  So this is not evidence, and I'm going to necessarily weigh in to it.  Now, you may incorporate the statements that the victims are going to say into your advocacy for what relief you think is warranted today.

But this is not meant to be evidence that I'm going to consider necessarily.  I don't, I don't envision we'll wait to hear what we are going to hear, but I'm not going to rule after each victim addresses the Court and say, oh, you're going to go into this bucket.

So that's not my intent.  My intent is to give them the fulsome opportunity to address the Court as they have a right to do.

MR. LEE: Thank you, Your Honor.

THE COURT: Okay.

MR. LEE: Would the Court like the Government to call?

THE COURT: Yep.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 20 of 129

MR. LEE: The first person we've identified is E-D-Y.  Edy.

THE COURT: And just to be clear, there will be no questioning of any of these folks that are coming up.  They're not going to be sworn in.  There's nothing unless you want to set some ground rules on what you want to do.

MR. FRENTZEN: No, Your Honor.

THE COURT: Okay.

MR. FRENTZEN: I'm happy to ask people questions, but I'm also happy to listen, Your Honor.

THE COURT: Right.  But my point is that I don't, I don't think this is meant to be an opportunity for you to examine.

MR. FRENTZEN: Understood.

THE COURT: Okay.  I just want to make sure we're all on the same page.

MR. FRENTZEN: Yes, Your Honor.

THE COURT: Okay.  Okay.  Okay, good morning.

EDIE: Good morning.  My name is Edie (inaudible).  Never in my wildest dreams did I imagine I would be standing here today, having to possibly lost everything we have worked for over our lifetime. Your Honor, thank you.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 21 of 129

And thank you to the Court and the prosecution for giving us a chance to be heard.  I'm speaking today on behalf of myself, my husband, and five close family -- families who have invested with him and all of the investors.

And I just want to tell you, there's 30 people out there that didn't get to come in and I, yeah, anyway.  My husband and I first invested with Ken Mattson in 2002.  Ken is highly intelligent, persuasive, and methodical.

We know now, based on what has been presented by the SEC, IRS, and FBI, he does not follow rules and authorities.  He should not be trusted.  If Ken is given freedom and access to technology, he will continue to act on his own interest.  The interest of all of the investors must now be the priority.

He has taken our peace of mind, our financial security, years of our hard work and trust, and so much more.  We ask the Court to recognize the scale of harm and act swiftly, and to protect others from further damage.  Please do not allow Ken Mattson to be released from trial.

Over the years, we gave Ken over $3.8 million.  This was not just money, it was our savings, our retirement accounts, the proceeds from three

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 22 of 129

rental properties, the home we lived in for 20 years, and our business that we built for 31 years. We trusted him completely.

We welcomed him into our home and business. He told us our investments were safe, diversified, and would provide lifelong income. The trust turned -- that trust turned out to be a tragic mistake.

For three decades, I built a private practice, working for 60 to 70 hours, managing every penny, saving diligently. My husband, Tom, helped me grow our precious business the last 21 years. We live modestly. We were frugal. We were disciplined.

We always gave Ken our annual savings because we believed we were securing our future. We sold our business, fortunately, in 2020, and in early 2023, we retired. We had thought we had done everything right.

85% of our income from our investment checks come from Ken -- for several -- from our investments. For several months now, we have received nothing. And worse, Ken recorded only one of our investments. The additional 14 were never recorded.

Now, after dedicating our lives to helping people and saving every dollar, we are being

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 23 of 129

forced to sell our last rental property, something we had hoped to pass on to our children.  My husband will likely have to return to work.  The emotional toll has been devastating.

The wasted energy, stress, anxiety, sleepless nights, sense of betrayal, anger, embarrassment, and shame are comparable only to my past trauma of losing both of my parents in a plane accident and going through a divorce.

Ken didn't just destroy our financial stability.  He shattered my ability to trust others and even to trust in myself.  To make things worse, over the past 20 years, I personally recommended Ken to five other investors.

Together, we have given him over $12 million now, without our investments, we all have only limited savings.  Ken's alleged criminal behavior has destroyed their credit.  They can't get credit cards. Two can't retire.  One is selling their home and moving out of state.

My dear friend, already retired and caring for her two elderly parents, has no income and can't even afford to fix her roof.  Ken exploited our trust with deliberate deception and charm.  I think everyone who spoke with him usually walked away

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 24 of 129

feeling reassured, believed, and thinking things were okay.

When we last met with Ken in June of 2024, he promised us again and again that our investments were real property, that they were secure, and that we would keep receiving monthly checks, and that he would provide us the updated list of our properties we were invested in.

He lied, and he will continue to lie. The check stopped. The documents never came. Please do not allow Ken Mattson to be released from trial. Thank you.

THE COURT: Thank you.

MR. LEE: Your Honor, I was informed there are approximately 30 more victims that are outside the Court who are -- just given the physical limitations, may not be able to --

THE COURT: I am fine if you want to add -- there's plenty of room here if you want them to -- yeah, that's fine. There's also seats in the front row here.

MR. LEE: Thank you, Your Honor, for that accommodation.

THE COURT: Okay.

MR. LEE: The next individual who would

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 25 of 129

like to speak is Denise.

THE COURT: Good morning.

DENISE: Good morning, Your Honor.  I'm reading this statement on behalf of my mother, who's an 85-year-old Chinese immigrant and a widow.  I'm very emotional being here because --

THE COURT: Of course.

DENISE: -- it's very hard to see Ken, who we loved, truly loved with all of our hearts and have deep spiritual and emotional and decades of just, positive and joyful interaction with and who we truly loved so much that when he came to talk to our family, we prayed for him instead of asking him all the questions that we should have.

So sorry if I get a little distracted. And so again, this is on behalf of my mother.  I respectfully ask this Court to deny bail and order the pretrial detention of Ken Mattson.  Mr. Mattson operated a Ponzi scheme that devastated hundreds of victims, including my daughter.

I am an investor.  Me and my late husband, Calvin, get some of the -- get some family trust.  Mr. Mattson's ongoing conduct, the severity of the charges, and the massive financial harm he caused make clear that pretrial release would pose an

ESQUIRE
DEPOSITION SOLUTIONS
Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 26 of 129

unacceptable risk to the public and to the integrity of this investigation for the following reasons:

First, Mr. Mattson is a high flight risk.  He's been caught carrying thousands of dollars in cash, more than enough for a one-way flight anywhere in the world, as a clear sign of preparation to flee at any moment.

Second, he travels with flash drives in his car, which even me as a Luddite knows you're not supposed to do, and it makes him easy to do whatever he needs to with that information at his disposal. His Ponzi scheme involved millions in investor money with vast sums of unaccounted for assets.  He has both the means and the motives to disappear.

And I just learned outside in the hallway that there was an article in which his son, Alex Mattson, was named the head of Mattson Ventures, which is a global financial investment company.

And that was set up in 2023, which means that he has the ability -- he has international contacts and the ability to go anywhere.  I had not known about this before, but it seems pretty sketchy.

Second, he's a danger to the community and I believe he's a danger to himself.  The scope of harm caused by Mr. Mattson's actions cannot be

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 27 of
129

overstated.  His scheme targeted retirees, widows, and the elderly like my mom, robbing them of their life savings.

My mom is an 85-year-old Chinese immigrant suffering from scleroderma, a debilitating and deadly autoimmune disease.  Mr. Mattson knew my mom was physically disabled and unable to work, and yet she still stopped her investment payments just one month after my dad died.

His actions left my mom not only grieving the loss of her husband, but terrified of losing her home and her independence.  Not to mention the fact that we read that he has firearms registered to his name.

He knows where every one of us lives, and he also had some sort of bulletproof vest, which suggests that a shootout isn't possible.  His conduct constitutes an ongoing danger, not just financial, but emotional, physical, and existential for elderly disabled victims like my mom.

And when he came to see us on May -- it was Memorial Day last year, my mom had a list of questions for him that she was so upset about.  And I said, mom, hold.  Because when I looked at Ken, I felt like he was -- there was a potential for self-harm and

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 28 of 129

suicide, and we cared more about his welfare.

And we spent the next hour praying for and ministering to him.  So much so that I had my pastor fly up from San Diego to spend time with him and his family, which his wife sent me an extensive text thanking me for doing that because it was so life-giving to his family.

Meanwhile, the entire time he was stealing from our family while we ministered to and poured into him and his family.  So I'm very concerned still, even now, that he is a threat to himself, because I know who Ken Mattson once was, and he was a man of conscience and deep faith, and I was worried about him.

And we continue to pray for him every night.  Sir, the severity of the charges are such that they're just -- they reflect the scale, complexity, and malicious intent behind the scheme.

It increases his incentive to flee if conviction becomes more likely, and it involves millions of dollars and potentially transnational components, further justifying pretrial detention. Fourth, the risk of obstruction, which you guys have covered extensively.

Not only have the things been said

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 29 of 129

about him deleting files, but there's video evidence that we read about that shows likely his wife or somebody else taking bags of documents to the trash the day before the authorities raided his home, which is a clear effort to destroy financial records or whatever it is that they were trying to hide and when they covered that camera.

He's used others, including close family members like his son and his wife, to shield assets and obstruct investigators.  And his wife is a 50% owner of one of his companies, which is also under scrutiny.

She is now scheduled for an oral deposition, and their ongoing access to each other presents a direct risk of continued obstruction and witness tampering.  I understand that the attempt to obstruct alone is criminal, it doesn't have to actually be done, but it seems that based on his past actions, he has already obstructed justice, and there's no reason for him to believe that he won't continue to.

And finally, fifth, there's a pattern of deceit and manipulation that every face in this room represents.  This is not a case of a one-time lapse in judgment.  Mr. Mattson lied repeatedly to

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 30 of 129

trusting investors. This is just a fraction of the investors that have been defrauded.

For nearly two decades, my family has invested with him. He'd sit at our dining room table and lie to us while looking directly in our eyes. And he's good. He's good at lying. He took money from the vulnerable, the most vulnerable, including myself, my mom, and my dad, while posing as a trusted family friend. And he accepted our invitation.

This is probably the hardest part for me to read to serve as a pallbearer, at my dad's funeral, which was on July -- middle of July last year, 2023. And then he cut off our income the very next month.

My dad, who was the biggest fighter for our family, my dad, who loved and protected and trusted him, passed away and was no longer there to protect and defend us. He cut my family off. He cut my mother off completely.

Your Honor, I cannot overstate the emotional, physical, and financial toll this man has inflicted on my mom, who is sick and cannot handle the emotional and mental stress of everything that's happened every single day.

We say thank God Dad passed away

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 31 of 129

because this would have killed him if not.  It certainly would have broken his heart.  I do not believe that Ken Mattson will stop.  You are all that stands between us and more harm.

And I beg you on behalf of my mother, my family, every person here, and all the others that will not have a chance to tell you how he has destroyed our lives.  Please do not release Ken Mattson.

MR. LEE: Your Honor, the next individual is Janice.

JANICE: Hi.  I'm not going to be able to go through this.  I only have a few things to say. We've had Ken for over 29 years as our financial advisor and my husband's entire family also and last -- two months ago -- and my sister also two months ago, my sister tried to commit suicide over all of this because she couldn't see a way out.

She couldn't go on.  So I am begging you.  He has harmed my family so tremendously.  And I am asking you, please don't let him out.  Detain him. He can't -- so that he can't do any more harm.  It's been the most emotional thing I've ever been through in my life.

We've had to go get medicine to be able

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 32 of 129

to deal with this.  Because we're at our wit's end.
Thinking we had such a wonderful retirement.  And you
would come to the house and sit at our table too, and
just give us so much hope.

But my sister almost lost her life over
this.  And for that, I'll never forgive you.  Never.
So I'm asking that you please don't let him out.
Please.  Thank you.

THE COURT: Thank you.

MR. LEE: Your Honor, the next
individual is Walter.

WALTER: Your Honor, thank you very much
for allowing me to speak.  My name is Walter
(inaudible), and I'm one of the many, many victims of
Ken's fraudulent scheme.  You see the attendance here.
All victims.  There are people in the hallway and
people at home who could not make it.

I got an email yesterday from a
gentleman who wanted to be here.  But unfortunately,
he's meeting with a real estate agent today because he
can no longer afford his house and has to sell it.
And I'm one of those many victims as well.

Mr. Mattson's conduct was neither
accidental nor the result of poor judgment.  It was
deliberate, ongoing, and deeply malicious.  And

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 33 of
129

consequently, many victims are now living with just the bare necessities, while Mr. Mattson and his family continue to live in comfort and luxury.

All of these people that came here to support the cause do not want Mr. Mattson being released.  And I'll give you two reasons why we oppose his release.

Number one, as evidence has shown, Mr. Mattson in the past was a master of hiding money.  We know about property sold in Del Mar to a third-party for which he sold.  Gave him a loan.

We have noticed that he's been obstructing justice.  And I would like to say, I work in high technology.  Mr. Frentzen's idea of computers is not just fiction, it's fantasy.  Don't fall for it.

The second reason is there is, we believe, a risk of flight.  Mr. Mattson does not follow the rules.  Rules do not apply to him.  He ignores SEC directives.  He doesn't file taxes for seven years while all of us do file taxes.

And there is absolutely nothing in the history of this person that would suggest that all of a sudden he's going to follow the rules and abide by Court rulings.  So therefore, on behalf of all the victims, please do not release Mr. Mattson out of

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 34 of 129

detention.  Thank you.

THE COURT: Thank you.

MR. LEE: Your Honor, the next individual is Ken.

KEN: Hello.  Your Honor.  Thank you.

THE COURT: Good morning.

KEN: My wife and I, Marci and I, met Ken Mattson in 1988.  He helped us sell our house and purchase another one.  Shortly thereafter, he helped us purchase three new rental houses, and a few years later, replaced them with three newer houses.

All of this was -- we owned the property.  It was not managed by him.  About 2007, Ken suggested we sell the houses, invest with him in an apartment complex in Southern California, which we did.

He'd been steering us right all along, and so we had confidence in his, his direction, suggestion.  Since then, we've invested about six more investments in Ken in full confidence because we were receiving monthly checks from these investments.

Our last investment was on January 24, 2024, for $50,000.  This was right -- a couple of months before FBI started checking it.  And although we never received any monies for this investment, all,

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 35 of
129

all checks ceased in March of 2024.

We had given him all our retirement savings, planning on using the returns for retirement. Our problem is that we lost everything we owned in (inaudible) Fire in August 2020.  So all of our records were lost.

We can only guess how much money we have invested with Ken, but we, we believe it's somewhere around $1 million.  Marci receives $1,800 a month from Social Security.  I receive about the same, and I get a little bit from a retirement from union, but it's not enough.

Nearly every month, I have to dip into a little savings that I have to pay our bills.  I don't know how long this will last.  At 77 and 75 years old, we are well past employment age.  This has put a lot of stress on each of us in our marriage.

We thought Ken was our friend as we've been to his house when he lived in Vacaville.  I've seen his muscle car collections.  I've helped his car caretaker.  We've even stored some of our cars in his warehouse.  After losing our home and now this, it's very devastating.

An example of Ken's manipulative ways. He always did our taxes.  For tax year 2023, we

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 36 of
129

received $1,800 back from the IRS.  For 2024, went to a different tax preparer, obviously, we had to pay $5,000 with about two-thirds less income.  So obviously some strange accounting going on here.

Your Honor, please do not let Ken Mattson out of jail while waiting for his trial.  He has proven that he cannot be trusted, and if he has access to a phone or internet, he will continue to manipulate money and property for his own use.  He has destroyed the lives of hundreds of hard-working folks for his gain.  Thank you, Your Honor.

THE COURT: Thank you.

MR. LEE: Your Honor, the next individual is Chris Dee.

THE COURT: Thank you.

MALE SPEAKER: Chris, Chris (inaudible) to be able to make it into the, into the room this afternoon.

MR. LEE: Thank you.  Next is Steve, Steve B.

THE COURT: Good morning.

STEVE: Good morning.  Thank you for allowing me to address the Court.

THE COURT: Of course.

STEVE: I was going to read a multiple-

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 37 of 129

page statement from my son-in-law.  But I was told to keep it short.  I, I basically want to tell -- ask the Court not to release him from custody because I feel that him being out would be a threat to all of us because he would be able to continue to disregard the Court orders and manipulate property, cash, and other possessions that really should be diverted back to the investors.

Ken, you knew what you were doing when you took the settlement money that my daughter got when she was dying from mesothelioma and you took all of that money that was supposed to provide for the family.  They have nothing now.  A three-year-old boy, two other kids are now with a single dad.

And you are controlling the money.  You should be ashamed of yourself.  You took money from my father, 94 years old.  He's struggling to make ends meet because you have his money.  My wife and I are struggling.

We had to rent our own house out in order to pay our way through life and live at a lower cost of living area.  Shame on you.  Just shame on you.  Please do not let him out on bail.  That's all I can say.  Thank you.

THE COURT: Thank you.

ESQUIRE
DEPOSITION SOLUTIONS

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 38 of 129

MR. LEE: The next individual is Mike M.

THE COURT: Good morning.

MIKE: Good morning.  Thank you for hearing me, and the rest of you for supporting the release of Ken from prison.  We -- I, I am against that.  And let me tell you a little bit about why. I'm a retired investment banker.

23 years of doing this.  I -- over the last 13 years, I sat down with Ken across from my table, and, and he has -- he -- we did 16 separate transactions in different limited partnerships.

$2.6 million, all of my retirement and, and some.  So look around.  There's so many that aren't here that are in the same kind of situation as me that the amount may not have been as much, but what he did is enough, demonstrating a constant and blatant disregard for the systems that he operates within and takes advantage of.

If nothing else, consider the Government's resources expended thus far in trying to unravel the -- his shell game web.  Every obfuscated transaction and act of web spinning does more damage to victims while incurring far more expenses and costs for those trying to untangle his web.  Your Honor, I was down in the basement meeting.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 39 of 129

We were -- we had about -- there were 60 people in there.  They were all pro-retain -- retaining him till the trial.  What they explained to us, though, was that maybe this is just some quirk of the system, but white collar crime, it's notorious or it's common in this district anyway, that they don't release the white collar criminal on bail.

And you even challenged the attorneys to try to find some other precedents.  I felt like that's us being told that there's a difference between wealthy people and poor people or people that just aren't of means.

And so when you look at what happened here, it sounds to me like murder was done to the financial well-being of all of these victims.  Our lives that we plan for and diligently work towards had been taken away by Ken Mattson.

It wasn't a violent physical crime, but it was murdered a financial, and it affected us the same way.  You -- I don't need to go into that.  He's already had a year to manipulate money, hide or transfer assets, lie and mislead investors, and destroy documents, which further victimizes us.

Since many investors never even received the proper documentation from Ken over the

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 40 of 129

years.  And the only threads of evidence of our money may be deleted forever, making any recovery process even more complex and exhausting.  We even saw that today with this -- the email or the deletions.

What's a deletion?  I mean, look at his intent.  Is he open to letting us -- helping us get past all of these legal maneuvers?  Or is he trying to protect himself?

I think you need to find that he's trying to protect himself, and he's making it tough for all of us people who he has already defrauded, for me, 16 times.  His actions, again and again show an utter disregard and respect for others, and he has already demonstrated his willingness to ignore the rules in service of his own benefit.

Your Honor, please keep Ken Mattson in jail until the trial.  There is no way that the danger he presents can be mitigated away.  Thank you.

THE COURT: Thank you.

MR. LEE: Your Honor, there are only two, two more individuals.  The first is Gwen P, and the second is David R, and that's it.

THE COURT: Okay.

GWEN: Thank you.  Judge (inaudible) for this opportunity to speak after being silenced for too

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 41 of 129

long. I thought I knew Ken for 43 plus years. I met him through my parents in the early 80s. I invested when he was working at Prudential, then RCM Company in Concord.

I met Tim when Ken quit RCM to form LeFever Mattson. I was an unpaid caregiver for both parents, and this is my generational inherited wealth. In July 2024, I received my last monthly income check from LaFever Mattson. This was three-quarters of my monthly income.

All funds were frozen by the FBI. Even my IRAs. The walls were closing in on LaFever Mattson. Ken's demeanor changed and there were more nervous laughs by him. He actually scolded me for communicating with Brenda Comfort, his then ex-assistant.

From LeFever Mattson's actions, I have financial anxiety, anxiety from having thousands of dollars in debt and have to soon get a job at age 71. I'm in therapy. Loss of security. Loss and gain of weight. Hair loss from extreme stress. Heart palpitations. Isolation from friends who believe you're going to ask them for funds.

I'm a member of the local food bank, so I can eat. The arrogance, lack of professionalism,

ESQUIRE  
DEPOSITION SOLUTIONS

800.211.DEPO (3376)  
EsquireSolutions.com

lack of shame, constant refusal to work with investors, and lack of care and concern has been unacceptable.  This is not only financial abuse, but senior abuse.  Ken used his quote unquote faith, manipulative skills, and quote unquote financial knowledge to betray all of us.

I have no faith in financial advisors or taxpayers anymore.  Ken is a danger to all investors, including prospective investors.  Ken should not be released from jail to do even more harm. Thank you, Your Honor.

THE COURT: Thank you.

MR. LEE: Your Honor, the last individual who would like to speak is David R.

THE COURT: Okay.

DAVID: Thank you, Your Honor.

THE COURT: Sure.

DAVID: Your Honor, I was, I was part of the effort to -- over the weekend to get people here. And there are about 60 folks here today.  We all met in the conference room downstairs, and many are elderly and can't get here, so we know there are hundreds and hundreds of victims.

Many, many folks wanted to be here today.  We have 60, which is a huge number considering

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 43 of 129

how difficult it is to get into the city.  But -- and
we have a few people stuck outside here for a while,
which was very frustrating to those folks.  But people
are, are clamoring to get here today.  And even on
last Friday we had 15, which was a good number.

All the witnesses are unanimous in
asking that Mattson be held in pretrial confinement,
because he is a flight risk and a danger to the
community at large.  He has firearms.  If he's given
access to electronic means and close proximity to his
family, again, he will not stop.

He will continue to do what he does,
which is move assets around and hide them from the
investors.  My wife and I have been married about 58
years, and we made our initial investments in 2007,
and like many in this room, made further incremental
investments over time.

Unfortunately, all told, we have lost
$3 million approximately.  This represents common to a
lot of the victims, a lifetime of honest work.  Over
the course of these many years, Mattson sent us fake
K-1s and other tax documents.

I'll just mention a few of the
investments I made.  One of them was an IRA, which I
thought was completely safe because the money was

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 44 of
129

wired to a custodial trust company. And it looks like, you know, Mattson was using the trust company as a front to kind of launder his money through on those IRAs. All those divi divi IRAs are fraudulent.

And those things go back to 2009. The other investment I'd like to highlight is in 2018, I referred Mattson to meet with my own daughter and son-in-law. My wife and I gifted them as a young couple $100,000 to invest, and they met with Mattson in a Vacaville Starbucks.

They later told me that he had driven to the meeting in a Rolls Royce. They, too, are out their investment. In 2022, Mattson hammered the final nail into our financial coffin when we moved to a retirement home in Auburn, and we were under the stress of moving, and he managed to talk us out of our IRA at that time.

I'm sure -- this happened in 2022, and I'm sure that by -22 -- 2022, Mattson recognized that his scheme was coming apart. Yet he continued to fuel it with anything he could steal from people. 2022, 2023.

Long after he was aware of the DOJ, DOJ investigation, and even after his home was searched in late May about one year ago, he continued to visit

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 45 of 129

victims.  He assured the victims that everything was okay.  I know a couple in their 80s who met Mattson in their home in July of 2024, and another single woman as late as August 6th, in-person meeting where everything was okay.

Mattson is a conman.  He did not earn his own money.  Everything he has came from our pockets.  He has lied and stolen from others.  The number of victims is staggering.  We have a large group here today.

Many more wanted to be here.  Many have had to return back.  Back to work, unfortunately, to support themselves.  It is shocking to learn just recently that Mattson was warned by the SEC about a year ago to retain documents, and he brazenly destroyed files and erased files off of his computer.

Mattson has proven to be a flight risk, a danger to others, and he has already obstructed justice.  His actions prove that he thinks he is above the law.  We are very concerned about his track record of hiding and dissipating assets.

If he has access to electronic devices, he can do a lot of damage.  His Ponzi scheme has devastated hundreds of victims.  He has already caused severe damage to so many lives.  He cannot be allowed

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 46 of 129

to continue.

The victims of a con struggle with embarrassment, shame, anxiety, and depression. We in this room are those victims. Mr. Mattson refer to us as his clients. We were his clients. Personally, I am ashamed that I was not able to shield my own family from this wicked man.

Your Honor, Mattson will not stop. We ask the Court to keep Mattson incarcerated. Please don't release him back to his lavish home while victims struggle to stay in their own. Thank you, Your Honor.

THE COURT: Thank you.

MR. LEE: Your Honor, we are done with the victims who wanted to provide statements.

THE COURT: Okay.

MR. LEE: How would the Court like to proceed (inaudible)?

THE COURT: Let me ask Mr. Frentzen. Is there anything you want to generally address the Court in response to anything that you've heard? You're not required to. I just want to not deprive counsel of an opportunity.

MR. FRENTZEN: No, Your Honor, I mean, obviously this is an extremely unfortunate situation.

Case: 26-01003    Doc# 1    Filed: 02/25/26    Entered: 02/25/26 20:36:54    Page 47 of 129

CERTIFICATE OF TRANSCRIPTIONIST


        I, JAMIE YOUNG, hereby certify that I was authorized to and did transcribe the provided recording and that the foregoing transcript is a true transcript of said electronic recording to the best of my ability.

        I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.


        DATED this 4th day of June, 2025.



                *Jamie Young*
        _____

        Jamie Young

# EXHIBIT B



# Title Report

File No.: 972500286

Property Address: 3003 Castle Road, Sonoma, CA 95476-4855

# Introducing LiveLOOK

LiveLOOK title document delivery system is designed to provide 24/7 real-time access to all information related to a title insurance transaction.

Access title reports, exception documents, an easy-to-use summary page, and more, at your fingertips and your convenience.

[To view your new Commonwealth Land Title LiveLOOK report, Click Here](#)



**Effortless, Efficient, Compliant, and Accessible**

# PRELIMINARY REPORT



99 Almaden Boulevard, Suite 840
San Jose, CA 95113

Issuing Policies of **Commonwealth Land Title Insurance Company**

**Order No.:** 972500286

TO:
Stapleton Group, a part of J.S. Held LLC
515 South Flower Street, 18th Floor
Los Angeles, CA 90071

Attn:      Cathy Garnica
Ref No.:

| | |
|---|---|
| Title Officer.: | Jeffrey Martin |
| Email: | Jeff.Martin@ctt.com |
| Phone No.: | 9252888062 |
| Fax No.: | 925-288-6413 |

| | |
|---|---|
| Escrow Officer: | Kiley Demaree |
| Email: | Kiley.Demaree@cltic.com |

99 Almaden Boulevard, Suite 840
San Jose, CA 95113
Phone No.:   (669) 231-7680
Fax No.:      (408) 273-6471

**Loan No.:**

Property:    3003 Castle Road, Sonoma, CA 95476-4855

In response to the application for a policy of title insurance referenced herein, **Commonwealth Land Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One.  The policy to be issued may contain an arbitration clause.  When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One.  Copies of the policy forms should be read.  They are available from the office which issued this report.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

The policy(ies) of title insurance to be issued hereunder will be policy(ies) of Commonwealth Land Title Insurance Company, a Florida corporation.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 51 of 129

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

Countersigned By:

_____
Authorized Officer or Agent
Ron Howarth

**Effective date:  May 7, 2025 at 07:30 AM**

The form of Policy or Policies of Title Insurance contemplated by this Report is:

ALTA Owner's Policy 2021

1.   The estate or interest in the Land hereinafter described or referred to covered by this Report is:

A Fee as to Parcel 1

Easement(s) more fully described below as to Parcel 2

2.   Title to said estate or interest at the date hereof is vested in:

KS Mattson Partners, LP, a California Limited Partnership, subject to proceedings pending in the bankruptcy court where a petition for relief was filed.

Name of Debtor:        KS Mattson Partners, LP
Date of Filing:           November 22, 2024
U.S. District Court:    Northern
Case No.:                  24-10715

3.   The Land referred to in this Report is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

# EXHIBIT A
Legal Description

**For APN/Parcel ID(s):    127-790-004-000**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF SONOMA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1:**

BEING A PORTION OF THE LANDS OF FRANKLIN VANDA KASPER AND MERRILL PURDY KASPER, TRUSTEES OF THE KASPER FAMILY LIVING TRUST, DATED FEBRUARY 18, 2003, AS DESCRIBED IN THOSE GRANT DEEDS RECORDED IN OFFICIAL RECORDS, AS DOCUMENT NUMBER 2003-214822, AND DOCUMENT NUMBER 2003-214823 AND THAT LOT LINE ADJUSTMENT GRANT DEED AS DOCUMENT NUMBER 2016035252, ALL SONOMA COUNTY RECORDS, SAID PORTIONS MORE PRECISELY HEREIN DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF LOT 1, AS SAID LOT IS SHOWN AND DELINEATED ON THAT PARCEL MAP NO. 94-830, RECORDED IN BOOK 574, PAGES 1-5, OF MAPS, SONOMA COUNTY RECORDS;

THENCE NORTH 00 DEGREES 01 MINUTES 48 SECONDS WEST ALONG THE WEST LINE OF SAID LOT 1, 556.32 FEET TO A SET 1/2 INCH IRON PIPE TAGGED LS3890;

THENCE LEAVING SAID WEST LINE NORTH 67 DEGREES 05 MINUTES 05 SECONDS EAST, 1339.53 FEET TO A SET 1/2 INCH IRON PIPE TAGGED LS3890;

THENCE NORTH 00 DEGREES 10 MINUTES 59 SECONDS EAST, 777.96 FEET TO A SET 1/2 INCH IRON PIPE TAGGED LS3890;

THENCE NORTH 48 DEGREES 26 MINUTES 14 SECONDS EAST, 218.35 FEET TO A SET 1/2 INCH IRON PIPE TAGGED LS3890;

THENCE NORTH 51 DEGREES 32 MINUTES 24 SECONDS EAST, 14.68 FEET TO A SET 1/2 INCH IRON PIPE TAGGED LS3890;

THENCE CONTINUING NORTH 51 DEGREES 32 MINUTES 24 SECONDS EAST, 403,79 FEET TO A SET ½ INCH IRON PIPE IRON TAGGED LS3890;

THENCE NORTH 51 DEGREES 43 MINUTES 19 SECONDS EAST, 85.19 FEET TO A SET SPIKE AND WASHER STAMPED LS3890 IN THE OF AN EXISTING ASPHALT ROAD;

THENCE ALONG THE CENTERLINE OF SAID EXISTING ROAD THE FOLLOWING COURSES: SOUTH 34 DEGREES 06 MINUTES 30 SECONDS WEST, 36.40 FEET;

THENCE SOUTH 20 DEGREES 47 MINUTES 42 SECONDS WEST, 50.47 FEET;

THENCE SOUTH 7 DEGREES 01 MINUTES 09 SECONDS WEST, 43.68 FEET;

THENCE SOUTH 15 DEGREES 15 MINUTES 46 SECONDS EAST, 33.74 FEET;

THENCE SOUTH 41 DEGREES 22 MINUTES 46 SECONDS EAST, 56.05 FEET;

THENCE SOUTH 35 DEGREES 35 MINUTES 15 SECONDS EAST, 61.76 FEET;

THENCE SOUTH 19 DEGREES 37 MINUTES 03 SECONDS EAST, 108.93 FEET TO A POINT ON THE SOUTHERLY LINE OF PARCEL 1 AS DESCRIBED IN SAID LOT LINE ADJUSTMENT GRANT DEED UNDER DOCUMENT NUMBER 2016-035252, BEING A POINT ON A NON-TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 82.21 FEET;

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 54 of 129

# EXHIBIT A
## Legal Description

THENCE SOUTHWESTERLY ALONG SAID CURVE, HAVING A CHORD WHICH BEARS SOUTH 41 DEGREES 33 MINUTES 25 SECONDS WEST, THROUGH A CENTRAL ANGLE OF 16 DEGREES 16 MINUTES 51 SECONDS FOR AN ARC DISTANCE OF 23.36 FEET TO A POINT ON THE EASTERLY LINE OF SAID LOT 1;

THENCE FOLLOWING THE EASTERLY LINE OF SAID LOT 1 THE FOLLOWING COURSES: SOUTH 23 DEGREES 40 MINUTES 38 SECONDS EAST, 450.49 FEET;

THENCE SOUTH 60 DEGREES 44 MINUTES 27 SECONDS WEST, 125.16 FEET;

THENCE SOUTH 18 DEGREES 11 MINUTES 14 SECONDS WEST, 274.95 FEET;

THENCE SOUTH 50 DEGREES 22 MINUTES 23 SECONDS EAST, 70.44 FEET;

THENCE SOUTH 68 DEGREES 42 MINUTES 14 SECONDS EAST, 120.49 FEET;

THENCE SOUTH 11 DEGREES 04 MINUTES 11 SECONDS WEST, 203.69 FEET;

THENCE SOUTH 3 DEGREES 44 MINUTES 04 SECONDS EAST, 79.00 FEET;

THENCE SOUTH 53 DEGREES 09 MINUTES 29 SECONDS EAST, 50.88 FEET;

THENCE SOUTH 71 DEGREES 40 MINUTES 57 SECONDS EAST, 43.54 FEET;

THENCE SOUTH 21 DEGREES 16 MINUTES 00 SECONDS WEST, 38.77 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 36.00 FEET;

THENCE SOUTHERLY AND SOUTHWESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 36 DEGREES 42 MINUTES 21 SECONDS FOR AN ARC DISTANCE 23.06 FEET;

THENCE SOUTH 55 DEGREES 58 MINUTES 00 SECONDS WEST, 34.57 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 42.00 FEET;

THENCE SOUTHERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 37 DEGREES 49 MINUTES 59 SECONDS FOR AN ARC DISTANCE OF 27.73 FEET;

THENCE SOUTH 18 DEGREES 08 MINUTES 00 SECONDS WEST, 80.23 FEET TO THE BEGINNING OF A TANGENT-CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 138.00 FEET;

THENCE SOUTHERLY ALONG THE CURVE THROUGH A CENTRAL ANGLE OF 19 DEGREES 18 MINUTES 00 SECONDS FOR AN ARC DISTANCE OF 46.49 FEET;

THENCE SOUTH 37 DEGREES 26 MINUTES 00 SECONDS WEST, 59.38 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 188.00 FEET;

THENCE SOUTHWESTERLY ALONG THE CURVE THROUGH A CENTRAL ANGLE OF 16 DEGREES 17 MINUTES 32 SECONDS FOR AN ARC DISTANCE OF 53.46 FEET;

THENCE SOUTH 53 DEGREES 43 MINUTES 32 SECONDS WEST, 67.89 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 72.00 FEET;

THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44 DEGREES 08 MINUTES 00 SECONDS FOR AN ARC DISTANCE OF 55.46 FEET;

THENCE SOUTH 9 DEGREES 35 MINUTES 32 SECONDS WEST, 26.71 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 50.00 FEET;

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 55 of 129

# EXHIBIT A
## Legal Description

THENCE SOUTHWESTERLY AND WESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 104 DEGREES 06 MINUTES 00 SECONDS FOR AN ARC DISTANCE OF 90.84 FEET; THENCE NORTH 66 DEGREES 18 MINUTES 28 SECONDS WEST, 86.67 FEET;

THENCE SOUTH 19 DEGREES 10 MINUTES 08 SECONDS EAST, 64.31 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 50.00 FEET;

THENCE SOUTHERLY AND NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 146 DEGREES 29 MINUTES 23 SECONDS FOR AN ARC LENGTH OF 127.84 FEET;

THENCE NORTH 52 DEGREES 40 MINUTES 45 SECONDS WEST, 245.47 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTH HAVING A RADIUS OF 45.00 FEET;

THENCE NORTHWESTERLY, WESTERLY, AND SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 100 DEGREES 00 MINUTES 25 SECONDS FOR AN ARC DISTANCE OF 78.55 FEET;

THENCE SOUTH 27 DEGREES 18 MINUTES 50 SECONDS WEST, 76.02 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 90.00 FEET;

THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 73 DEGREES 53 MINUTES 14 SECONDS FOR AN ARC DISTANCE OF 116.06 FEET;

THENCE SOUTH 00 DEGREES 39 MINUTES 19 SECONDS EAST, 278.77 FEET TO THE SOUTHEAST CORNER OF SAID LOT 1;

THENCE ALONG THE SOUTH LINE OF SAID LOT 1 SOUTH 89 DEGREES 20 MINUTES 41 SECONDS WEST, 1175.51 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH THAT AGREEMENT OF GRANT OF EASEMENT AS RECORDED IN OFFICIAL RECORDS AS DOCUMENT NUMBER 1996-065529, SONOMA COUNTY RECORDS.

ALSO TOGETHER WITH THAT AGREEMENT OF GRANT OF NEW EASEMENT AND EXTINGUISHMENT OF EXISTING EASEMENT AS RECORDED IN OFFICIAL RECORDS AS DOCUMENT NUMBER 1997-060967, SONOMA COUNTY RECORDS.

**PARCEL 2:**

BEING THAT "NEW 40 FOOT PRIVATE ROAD AND PUBLIC UTILITY EASEMENT" AS DESCRIBED IN EXHIBIT "G" OF THE ABANDONMENT AND GRANT OF PRIVATE ROAD AND PUBLIC UTILITY EASEMENT RECORDED IN OFFICIAL RECORDS AS DOCUMENT NUMBER 2019-058276, SONOMA COUNTY RECORDS, AND ITS NORTHERLY EXTENSION TO THE MOST NORTHERLY CORNER OF THE HEREIN DESCRIBED PARCEL ONE, EXCEPTING THAT PORTION OF SAID EASEMENT LYING WITHIN SAID PARCEL ONE.

ALSO KNOWN AS LOT A IN THE LOT LINE ADJUSTMENT GRANT DEED RECORDED DECEMBER 23, 2020, AS INSTRUMENT NO. 2020123647, OF OFFICIAL RECORDS.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 56 of 129

### EXCEPTIONS

At the date hereof, items to be considered and exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

1.      Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2025-2026.

2.      Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

        | | |
        |---|---|
        | Code Area: | 158-046 |
        | Tax Identification No.: | 127-790-004-000 |
        | Fiscal Year: | 2024-2025 |
        | 1st Installment: | $0.00 No Taxes Due |
        | 2nd Installment: | $82,480.83 Open |
        | Land: | $2,455,344.00 |
        | Improvements: | $4,827,456.00 |

3.      Said property has been declared tax defaulted for non-payment of delinquent taxes for the fiscal year 2022-2023 and 2023-2024.

        | | |
        |---|---|
        | Tax Identification No.: | 127-790-004-000 |
        | Default No.: | DEF230001525 |
        | Default Date: | June 30, 2023 |

        Amounts to redeem for the above-stated fiscal year (and subsequent years if any) are:

        | | |
        |---|---|
        | Amount: | $84,656.08 by May 31, 2025 |
        | Amount: | $85,597.84 by June 30, 2025 |

4.      Supplemental assessment for 2024-2025:

        | | |
        |---|---|
        | 1st Installment | $19,553.13, Open |
        | Must be Paid By: | June 30, 2025 |
        | 2nd Installment: | $19,553.13, Open |
        | Must be Paid By: | October 31, 2025 |

5.      Prior to close of escrow, please contact the Tax Collector's Office to confirm all amounts owing, including current fiscal year taxes, supplemental taxes, escaped assessments and any delinquencies.

6.      All taxes or assessments approved, levied or enacted by the State, County, Municipality, Township or similar taxing authority, which are not yet due and payable, including but not limited to any retroactive increases in taxes or assessments resulting from any retroactive increase in the valuation of the land by the State, County, Municipality, Township, or other taxing authority.

        Any possible charges or assessments for water bills, public utilities, code enforcement and sanitary bills which may exist, but have not yet been recorded and/or filed.

7.      Any liens or other assessments, bonds, or special district liens including without limitation, Community Facility Districts, that arise by reason of any local, City, Municipal or County Project or Special District.

8.      The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 57 of 129

9. The herein described property lies within the boundaries of a Mello-Roos Community Facilities District (CFD) as follows:

   CFD No.:         M/R CFD#1 SCHELL VISTA FIRE - MELLO ROOS

   This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Sonoma. The tax may not be prepaid.

10. Water rights, claims or title to water, whether or not disclosed by the public records.

11. Easement(s) or right(s) of way for the purpose(s) shown below and rights incidental thereto, as granted and/or reserved in various deeds of record:

    Purpose:         Ingress and egress, pipelines, drainage and/or public utilities and incidental purposes thereto over, under, along and across the easement parcel(s) herein described
    Affects:         Parcel 2

12. Easement(s) in favor of the public over any existing roads lying within said Land.

13. Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

    Granted to:       Pacific Gas and Electric Company and Pacific Telephone and Telegraph Company, a California Corporation
    Purpose:         Public utilities
    Recording Date:   July 15, 1941
    Recording No.:    Book 528, Page 352, of Official Records
    Affects:         A portion of said land

14. Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, genetic information, medical condition, citizenship, primary language, and immigration status, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

    Recording Date:   August 4, 1948
    Recording No.:    Book 815, Page 328, of Official Records

15. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters shown on

    Map:          Record of Survey
    Recording No.:    Book 492, Page 16, of Records of Surveys

16. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters shown on

    Map:          Record of Survey
    Recording No.:    Book 525, Page 40, of Records of Surveys

17. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters shown on

    Map:          Record of Survey
    Recording No.:    Book 809, Page 50, of Records of Surveys

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 58 of 129

18.    Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters shown on

Map:                    Record of Survey
Recording No.:          Book 818, Page 36, of Records of Surveys

19.    Matters contained in that certain document

Entitled:               Agreement of Grant of Easement
Dated:                  June 26, 1996
Executed by:            Richard Torretto and Linda Torretto, his wife, co-trustees and Robert C.
                        Friese et al.
Recording Date:         July 23, 1996
Recording No.:          96-0065529, of Official Records

Reference is hereby made to said document for full particulars.

20.    Matters contained in that certain document

Entitled:               Agreement of Grant of New Easement and Extinguishment of Existing Easement
Dated:                  October 19, 1996
Executed by:            William W. Godward, successor trustee of The Frank H. Bartholomew Foundation,
                        a Trust Agreement dated July 14, 1981, as amended; Robert C. Friese; Chandra
                        Friese and Van Kasper and Merrill Purdy Kasper, formerly Merrill Purdy
Recording Date:         July 17, 1997
Recording No.:          97-0060967, of Official Records

Reference is hereby made to said document for full particulars.

21.    All easements, recitals, offers and dedications as shown on the official map.

Tract of:               Parcel Map No. 94-830 recorded in Book 574, Page 1, of Parcel Maps

22.    Matters contained in that certain document

Entitled:               Agreement for Subdivision Improvement for Parcel Map No. 94-830
Dated:                  October 21, 1997
Executed by:            County of Sonoma; Robert C. Friese; Chandra Friese; Van Kasper and Merrill
                        Purdy Kasper
Recording Date:         December 10, 1997
Recording No.:          1997-0114000, of Official Records

Reference is hereby made to said document for full particulars.

23.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:             F. Van Kasper and Merrill Purdy Kasper, husband and wife as community
                        property
Purpose:                Road and public utilities
Recording Date:         January 16, 1998
Recording No.:          1998-0004111, of Official Records
Affects:                A portion of said land

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 59 of
129

24.     Matters contained in that certain document

      Entitled:               Declaration of Restrictions to Maintain a Structure as a Guest House
      Dated:                 August 3, 1998
      Executed by:       Van and Merrill Kasper
      Recording Date:    August 3, 1998
      Recording No.:     1998-0088016, of Official Records

      Reference is hereby made to said document for full particulars.

25.     Matters contained in that certain document

      Entitled:               Declaration of Acknowledging Right to Farm
      Dated:                 December 21, 2015
      Executed by:       Franklin Vanda Kasper and Merrill Purdy Kasper
      Recording Date:    April 22, 2016
      Recording No.:     2016035249, of Official Records

      Reference is hereby made to said document for full particulars.

26.     Matters contained in that certain document

      Entitled:               Declaration Acknowledging Right to Farm
      Dated:                 December 21, 2015
      Executed by:       Franklin Vanda Kasper and Merrill Purdy Kasper
      Recording Date:    April 22, 2016
      Recording No.:     2016035250, of Official Records

      Reference is hereby made to said document for full particulars.

27.     Matters contained in that certain document

      Entitled:               Abandonment and Grant of Private Road and Public Utility Easement
      Dated:                 July 18, 2019
      Executed by:       Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                           Friese, Mark Earl Friese, Laura Moore Friese and Chandra L. Friese, as
                           Co-Trustees
      Recording Date:    August 21, 2019
      Recording No.:     2019058276, of Official Records

      Reference is hereby made to said document for full particulars.

28.     Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, genetic information, medical condition, citizenship, primary language, and immigration status, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

      Recording Date:    August 22, 2019
      Recording No.:     2019-58562, of Official Records

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 60 of 129

29.     Matters contained in that certain document

Entitled:            Grant of Private Road and Public Utility Easements
Dated:               August 12, 2019
Executed by:         Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                     Friese, Mark Earl Friese, Laura Moore Friese and Chanda L. Friese, as
                     Co-Trustees
Recording Date:      August 22, 2019
Recording No.:       2019-58563, of Official Records

Reference is hereby made to said document for full particulars.

30.     Matters contained in that certain document

Entitled:            Grant of Underground Public and Private Utility Easement
Dated:               July 18, 2019
Executed by:         Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                     Friese, Mark Earl Friese, Laura Moore Friese and Chandra L. Friese, as
                     Co-Trustees
Recording Date:      August 22, 2019
Recording No.:       2019-58564, of Official Records

Reference is hereby made to said document for full particulars.

31.     Matters contained in that certain document

Entitled:            Grant of Overhead Public and Private Utility Easement
Dated:               July 18, 2019
Executed by:         Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                     Friese, Mark Earl Friese, Laura Moore Friese and Chandra L. Friese, as
                     Co-Trustees
Recording Date:      August 22, 2019
Recording No.:       2019-58565, of Official Records

Reference is hereby made to said document for full particulars.

32.     Matters contained in that certain document

Entitled:            Grant of Overhead Public and Private Utility Easement
Dated:               July 8, 2019
Executed by:         Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                     Friese, Mark Earl Friese, Laura Moore Friese and Chandra L. Friese,
                     Co-Trustees
Recording Date:      August 22, 2019
Recording No.:       2019-58566, of Official Records

Reference is hereby made to said document for full particulars.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 61 of 129

33.    Matters contained in that certain document

       Entitled:          Vineyard Access Easement Agreement
       Dated:             August 16, 2019
       Executed by:     Franklin Vanda Kasper, Merrill Purdy Kasper, Trustees and Matthew Robert
                         Friese, Mark Earl Friese, Laura Moore Friese and Chandra L. Friese, as
                         Co-Trustees
       Recording Date:  August 23, 2019
       Recording No.:   2019-58738, of Official Records

       Reference is hereby made to said document for full particulars.

34.    A deed of trust to secure an indebtedness in the amount shown below,

       Amount:           $4,700,000.00
       Dated:             May 24, 2023
       Trustor/Grantor   K.S. Mattson Partners, LP, a California Limited Partnership
       Trustee:          Stewart Title, a title & escrow company
       Beneficiary:      WE Alliance Secured Income Fund, LLC
       Loan No.:        23-74
       Recording Date:  June 12, 2023
       Recording No.:   2023026021, of Official Records

This Company will require that the original note, the original deed of trust and a properly executed request for full reconveyance together with appropriate documentation (i.e., copy of trust, partnership agreement or corporate resolution) be in this office prior to the close of this transaction if the above-mentioned item is to be paid through this transaction or deleted from a policy of title insurance.

Any demands submitted to us for payoff must be signed by all beneficiaries as shown on said deed of trust, and/or any assignments thereto.  In the event said demand is submitted by an agent of the beneficiary(s), we will require the written approval of the demand by the beneficiary(s).  Servicing agreements do not constitute approval for the purposes of this requirement.

If no amounts remain due under the obligation a zero balance demand will be required along with the reconveyance documents.

In addition, we require the written approval of said demand by the trustor(s) on said deed of trust or the current owners if applicable.

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

       Trustee:          Mortgage Lender Services
       Recording Date:  November 18, 2024
       Recording No.:   2024056780, of Official Records

A notice of default under the terms of said trust deed

       Executed by:     Mortgage Lender Services
       Recording Date:  November 18, 2024
       Recording No:    2024056781, of Official Records

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 62 of 129

35.     Any matters arising out of or by virtue of that certain bankruptcy case:

Name of Debtor:      KS Mattson Partners. LP
Date of Filing:         November 22, 2024
U. S. District Court:  Northern
State:                     California
Case No.:                24-10715

Any defect or invalidity of the lien of said lien referenced above, arising out of or occasioned by any violation of the Bankruptcy Code.

36.     Any defect or invalidity of the title to said Land arising out of or occasioned by a violation of the Bankruptcy Code.

37.     Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract, license and/or lease, together with all supplements, assignments and amendments thereto, before issuing any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

38.     Any easements not disclosed by the public records as to matters affecting title to real property, whether or not said easements are visible and apparent.

39.     Any lien or right to a lien for services, labor or material not shown by the Public Records.

40.     Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters which a correct survey would disclose and which are not shown by the public records.

41.     Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

42.     The transaction contemplated in connection with this Report is subject to the review and approval of the Company's Corporate Underwriting Department.  The Company reserves the right to add additional items or make further requirements after such review.

**END OF EXCEPTIONS**

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

Case: 26-01003    Doc# 1    Filed: 02/25/26    Entered: 02/25/26 20:36:54    Page 63 of 129

## REQUIREMENTS

1.      The Company will require that an Owner's Affidavit be completed by the party(s) named below before the issuance of any policy of title insurance.

   Party(ies):                Vestee(s) herein

   The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit.

2.      Before issuing its policy of title insurance, the Company will require the following for the below-named limited partnership:

   Name:  KS Mattson Partners, LP, a California Limited Partnership

   a.      Certificate of Limited Partnership filed with the Secretary of State, in compliance with the provision of the California Revised Limited Partnership Act, Section 15611 et. seq., Corporations Code.

   b.      Certified Copy of the Certificate of Limited Partnership certified by the Secretary of State filed with the County Recorder.

   The Company reserves the right to add additional items or make further requirements after review of the requested documentation

3.      The requirement that the complete and correct name(s) of the buyer(s) in this transaction be submitted to the Title Department at least 5 days prior to the close of Escrow.

### END OF REQUIREMENTS

## INFORMATIONAL NOTES

1.      Note:  The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land a Single Family Residence, known as 3003 Castle Road, Sonoma, CA, to an Extended Coverage Loan Policy.

2.      Note:  The name(s) of the proposed insured(s) furnished with this application for title insurance is/are:

        No names were furnished with the application.  Please provide the name(s) of the buyers as soon as possible.

3.      Note:  There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

4.      Note:   The charge for a policy of title insurance, when issued through this application for title insurance, will be based on the Short Term Rate.

5.      Notice:  Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

6.      The application for title insurance was placed by reference to only a street address or tax identification number. The proposed Insured must confirm that the legal description in this report covers the parcel(s) of Land requested to be insured. If the legal description is incorrect, the proposed Insured must notify the Company and/or the settlement company in order to prevent errors and to be certain that the legal description for the intended parcel(s) of Land will appear on any documents to be recorded in connection with this transaction and on the policy of title insurance.

7.      Note:  If a county recorder, title insurance company, escrow company, real estate broker, real estate agent or association provides a copy of a declaration, governing document or deed to any person, California law requires that the document provided shall include a statement regarding any unlawful restrictions.  Said statement is to be in at least 14-point bold face type and may be stamped on the first page of any document provided or included as a cover page attached to the requested document.  Should a party to this transaction request a copy of any document reported herein that fits this category, the statement is to be included in the manner described.

8.      Note:  Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of a Company agent, an authorized employee of the insured lender, or by using Bancserv or other Company-approved third-party service.  If the above requirement cannot be met, please call the Company at the number provided in this report.

9.      Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax.  If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

10.     Note:  The policy of title insurance will include an arbitration provision.  The Company or the insured may demand arbitration.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation.  Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

### END OF INFORMATIONAL NOTES

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 65 of 129



# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|:---:|:---:|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2025

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

## Collection of Personal Information

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.,* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.,* loan or bank account information);
- biometric data (e.g., fingerprints, retina or iris scans, voiceprints, or other unique biological characteristics; and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

## Collection of Browsing Information

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

## Other Online Specifics

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for these main purposes:

- To provide products and services to you or in connection with a transaction involving you.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 67 of 129

- To improve our products and services.
- To prevent and detect fraud;
- To maintain the security of our systems, tools, accounts, and applications;
- To verify and authenticate identities and credentials;
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.
- To provide reviews and testimonials about our services, with your consent.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

## State-Specific Consumer Privacy Information:

For additional information about your state-specific consumer privacy rights, to make a consumer privacy request, or to appeal a previous privacy request, please follow the link Privacy Request, or email privacy@fnf.com or call (888) 714-2710.

Certain state privacy laws require that FNF disclose the categories of third parties to which FNF may disclose the Personal Information and Browsing Information listed above. Those categories are:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Business in connection with the sale or other disposition of all or part of the FNF business and/or assets;
- Service providers;
- Law endorsement or authorities in connection with an investigation, or in response to a subpoena or court order.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (fnf.com/california-privacy) or call (888) 413-1748.

For Nevada Residents: We are providing this notice pursuant to state law. You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. For further information concerning Nevada's telephone solicitation law, you may contact: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginquiries@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.  For additional information about your Oregon consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710

FNF is the controller of the following businesses registered with the Secretary of State in Oregon:
Chicago Title Company of Oregon, Fidelity National Title Company of Oregon, Lawyers Title of Oregon, LoanCare, Ticor, Title Company of Oregon, Western Title & Escrow Company, Chicago Title Company, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, Fidelity National Title Insurance Company, Liberty Title & Escrow, Novare National Settlement Service, Ticor Title Company of California, Exos Valuations, Fidelity & Guaranty Life, Insurance Agency, Fidelity National Home Warranty Company, Fidelity National Management Services, Fidelity Residential Solutions, FNF Insurance Services, FNTG National Record Centers, IPEX, Mission Servicing Residential, National Residential Nominee Services, National Safe Harbor Exchanges, National Title Insurance of New York, NationalLink Valuations, NexAce Corp., ServiceLink Auction, ServiceLink Management Company, ServiceLink Services, ServiceLink Title Company of Oregon, ServiceLink Valuation Solutions, Western Title & Escrow Company

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do <u>not</u> collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**
If you have questions or would like to correct your Personal Information, visit FNF's Privacy Request website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 69 of 129

# ATTACHMENT ONE

## CALIFORNIA LAND TITLE ASSOCIATION
## STANDARD COVERAGE POLICY - 1990 (11-09-18)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

    (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

    (c) resulting in no loss or damage to the insured claimant;

    (d) attaching or created subsequent to Date of Policy; or

    (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART II

*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

Attachment One (11/04/22)

Case: 26-01003    Doc# 1    Filed: 02/25/26    Entered: 02/25/26 20:36:54    Page 70 of 129

# ATTACHMENT ONE
## (CONTINUED)

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE OWNER'S POLICY (02-04-22)**
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
        i.   the occupancy, use, or enjoyment of the Land;
        ii.  the character, dimensions, or location of any improvement on the Land;
        iii. the subdivision of land; or
        iv.  environmental remediation or protection.
    b.  any governmental forfeiture, police, regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by the Insured Claimant;
    b.  not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    c.  resulting in no loss or damage to the Insured Claimant;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
    e.  resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
        i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
        ii.  for any other reason not stated in Covered Risk 9.b.
5.  Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6.  Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.
    Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7   Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

### PART I

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

### PART II
*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

Attachment One (11/04/22)

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 71 of 129

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (7-01-21)
## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy and We will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
    i.   the occupancy, use, or enjoyment of the Land;
    ii.  the character, dimensions, or location of any improvement on the Land;
    iii. the subdivision of land; or
    iv.  environmental remediation or protection.
    b.  any governmental forfeiture, police, or regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23, or 27.
2.  Any power to take the Land by condemnation. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 17.
3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by You;
    b.  not Known to Us, not recorded in the Public Records at the Date of Policy, but Known to You and not disclosed in writing to Us by You prior to the date You became an Insured under this policy;
    c.  resulting in no loss or damage to You;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 5, 8.f., 25, 26, 27, 28, or 32); or
    e.  resulting in loss or damage that would not have been sustained if You paid consideration sufficient to qualify You as a bona fide purchaser of the Title at the Date of Policy.
4.  Lack of a right:
    a.  to any land outside the area specifically described and referred to in Item 3 of Schedule A; and
    b.  in any street, road, avenue, alley, lane, right-of-way, body of water, or waterway that abut the Land.
    Exclusion 4 does not modify or limit the coverage provided under Covered Risk 11 or 21.
5.  The failure of Your existing structures, or any portion of Your existing structures, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 14 or 15.
6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transfer of the Title to You is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
        i.  to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
        ii. for any other reason not stated in Covered Risk 30.
7.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
8.  Negligence by a person or an entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.
9.  Any lien on Your Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 9 does not modify or limit the coverage provided under Covered Risk 8.a or 27.
10. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

*   For Covered Risk 16, 18, 19 and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|                  | Your Deductible Amount                                                        | Our Maximum Dollar Limit of Liability |
| ---------------- | ----------------------------------------------------------------------------- | ------------------------------------- |
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less)    | $ 10,000.00                           |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less)    | $ 25,000.00                           |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less)    | $ 25,000.00                           |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less)    | $  5,000.00                           |

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 72 of 129

**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $  5,000.00 |

Attachment One (11/04/22)

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 73 of 129

## ALTA OWNER'S POLICY (07-01-2021)
## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
        i.   the occupancy, use, or enjoyment of the Land;
        ii.  the character, dimensions, or location of any improvement on the Land;
        iii. the subdivision of land; or
        iv.  environmental remediation or protection.
    b.  any governmental forfeiture, police, regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2.  Any power of eminent domain.  Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by the Insured Claimant;
    b.  not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    c.  resulting in no loss or damage to the Insured Claimant;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
    e.  resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
        i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
        ii.  for any other reason not stated in Covered Risk 9.b.
5.  Any claim of a PACA-PSA Trust.  Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6.  Any lien on the Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.  Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated.  Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

*NOTE:  The 2021 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage.  In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed as 1 through 7 below:*

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land or (b) asserted by persons or parties in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 74 of 129

# ATTACHMENT ONE
## (CONTINUED)

## 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i)   the occupancy, use, or enjoyment of the Land;

    (ii)  the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv)  environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

*NOTE:  The 2006 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed below as 1 through 7 below:*

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.]

7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

Attachment One (11/04/22)

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 75 of 129

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Companies**
CTC - Chicago Title Company
CLTC - Commonwealth Land Title Company
FNTC - Fidelity National Title Company
FNTCCA - Fidelity National Title Company of California
TICOR - Ticor Title Company of California
LTC - Lawyer's Title Company
SLTC - ServiceLink Title Company

**Underwritten by FNF Underwriters**
CTIC - Chicago Title Insurance Company
CLTIC - Commonwealth Land Title Insurance Co.
FNTIC - Fidelity National Title Insurance Co.
NTINY - National Title Insurance of New York

## Available Discounts

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, CLTIC, FNTIC, NTINY)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty percent (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

**DISASTER AREA TRANSACTIONS (CTIC, CLTIC, FNTIC, NTINY)**
This rate is available for individuals or entities that were victims of a national or state disaster. The rate can be used for a Lender's Policy (Standard or Extended), or an Owner's Policy (Standard or Homeowners coverage). To qualify for this rate, the applicant must, prior to the closing of the applicable transaction, make a written request, including a statement meeting the following criteria:

A. The subject property is in a disaster area declared by the government of the United States or the State of California.

B. The subject property was substantially or totally destroyed in the declared disaster.

C. The subject property ownership has not changed since the time of the disaster.

The rate will be fifty percent (50%) of the applicable rate, and the transaction must be completed within sixty (60) months of the date of the declaration of the disaster.

**DISASTER AREA ESCROWS (CTC, CLTC, FNTC, TICOR, LTC)**
This rate is available for individuals or entities that were victims of a national or state disaster. The rate can be used for a loan or a sale escrow transaction. To qualify for this rate, the applicant must, prior to the closing of the applicable transaction, make a written request, including a statement meeting the following criteria:

A. The subject property is in a disaster area declared by the government of the United States or the State of California.

B. The subject property was substantially or totally destroyed in the declared disaster.

C. The subject property ownership has not changed since the time of the disaster.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 76 of 129

# Notice of Available Discounts

(continued)

The rate will be fifty percent (50%) of the applicable rate, and the transaction must be completed within sixty (60) months of the date of the declaration of the disaster. Standard minimum charge applies based upon property type. No other discounts or special rates, or combination of discounts or special rates, shall be applicable. Applies to a single transaction per property.

This rate is applicable to the following Zones/Counties:

Zone 1.A: Orange County
Zone 1.B: Riverside and San Bernardino Counties
Zone 2: Los Angeles County
Zone 3: Ventura County
Zone 10: San Diego County
Zone 12: Imperial County

If used for a sale transaction, the application of this rate assumes the charge for the Residential Sale Escrow Services (RSES) fee will be split evenly between buyer and seller. As such and regardless of how the calculated applicable RSES will be split between the disaster victim and the other principal, the rate will be applied only to one half (1/2) of the calculated applicable RSES fee, regardless of whether the disaster victim is paying half (1/2) of the RSES fee (as is customary) or paying the entire fee. The rate under this provision will be fifty percent (50%) of disaster victims' one half (1/2) portion only and shall not apply to any portion paid by non-disaster victim. Additional services will be charged at the normal rates.

**MILITARY DISCOUNT RATE (CTIC, CLTIC, FNTIC)**
Upon the Company being advised in writing and prior to the closing of the transaction that an active duty, honorably separated, or retired member of the United States Military or Military Reserves or National Guard is acquiring or selling an owner occupied one-to-four family property, the selling owner or acquiring buyer, as applicable, will be entitled to a discount equal to fifteen percent (15%) of the otherwise applicable rates such party would be charged for title insurance policies. Minimum charge: Four Hundred Twenty-Five And No/100 Dollars ($425.00)

The Company may require proof of eligibility from the parties to the transaction verifying they are entitled to the discount as described. No other discounts or special rates, or combination of discounts or special rates, shall be applicable.

**MILITARY RATE (SLTC)**
A discount of twenty percent (20%) off the purchase transaction closing and settlement fee or a discount of One Hundred And No/100 Dollars ($100.00) off the refinance closing and settlement fee, will be applied when the loan is guaranteed by the United States Veterans Administration and the escrow fee is being paid by the consumer and is listed as paid by borrower on the Closing Disclosure and final Settlement Statement.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 77 of 129

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 78 of 129

NOTE: This map was prepared for the Sonoma County Assessor for assessment purposes only and does not indicate parcel legality or valid building sites. To verify legal parcel status check with your city or county development or planning division. No liability is assumed for the accuracy of the data delineated.

This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

# COUNTY ASSESSOR'S PARCEL MAP

**TAX RATE AREA 158-046**

**127-79**



Ptn of Parcel Map No. 94-830
REC 12-10-1997 IN BK.574, MAPS, PGS. 01-05

PM 94-830

SCALE: 1"=400'

Assessor's Map Bk.127, Pg. 79
Sonoma County, Calif. (ACAD)

KEY   11-23-16=3   KB

REVISED
04-02-20=R/S DL
06-18-21=R/S DL
06-22-21=5 DL

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 79 of
129

This map/plat is being furnished as an aid in locating
the herein described Land in relation to adjoining
streets, natural boundaries and other land, and is
not a survey of the land depicted. Except to the
extent a policy of title insurance is expressly
modified by endorsement, if any, the company
does not insure dimensions, distances, location of
easements, acreage or other matters shown
thereon.

NOTE: This map was prepared for the Sonoma County Assessor for assessment purposes only and does
not indicate parcel legality or valid building sites. To verify legal parcel status check with your city or
county development or planning division. No liability is assumed for the accuracy of the data delineated.



# COUNTY ASSESSOR'S PARCEL MAP

TAX RATE AREA
158-046

127-79

SCALE: 1" = 400'

Assessor's Map Bk. 127, Pg. 79
Sonoma County, Calif. (ACAD)

KEY    11-23-16=3    KB

REVISED
04-02-20=R/S DL
06-18-21=R/S DL
06-22-21=5 DL

# EXHIBIT C



Hogan Lovells US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
T  +1 310 785 4600
F  +1 310 785 4601
www.hoganlovells.com

August 22, 2025

**VIA ELECTRONIC MAIL**

Randy Sue Pollock
Law Offices of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, California  94610

  **Re:  Kenneth Mattson and KS Mattson Partners, LP**

Dear Randy Sue:

I write to address some important issues regarding Mr. Mattson and KSMP.



Hogan Lovells US LLP is a limited liability partnership registered in the state of Delaware.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Berlin  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dublin  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Philadelphia  Riyadh  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Tokyo  Washington, D.C.  For more information see www.hoganlovells.com.

Randy Sue Pollack    - 2 -
Law Offices of Randy Sue Pollock





Separately, we understand that both Mr. Mattson and his daughter are currently residing in properties owned by KSMP. To our knowledge, there are no leases in place for either property and no rent has been paid. Occupying estate property without paying rent is not permissible. If Mr. Mattson and his daughter wish to remain in these properties, they must promptly enter into lease agreements at market rent. Please confirm their intentions by no later than Tuesday, September 2, 2025. Absent a response, KSMP will have no choice but to pursue appropriate legal remedies.



Randy Sue Pollack                 - 4 -
Law Offices of Randy Sue Pollock

We propose a call among counsel next week to further address the issues described herein.  Please let us know when you can make yourself available.

Sincerely,

Erin N. Brady
Partner
erin.brady@hoganlovells.com
D (310) 785-4604

# EXHIBIT D

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Date:** September 9, 2025 at 5:25:29 PM PDT
**To:** "Brady, Erin" <erin.brady@hoganlovells.com>
**Subject: Ken Mattson**


**[EXTERNAL]**
Hi Erin,
Ken hasn't had his neurological testing yet but I spoke to Stacy.  They said Castle Road is three parcels and selling it might take a while.  It was vacant and on the market for 2 years before Ken bought it.  If they must move out can they live in Rachel Road until maybe January.  Their daughter is at a different address.
There is a nasty investor across the street from them in Piedmont.  Also, their church and bible study group are in Sonoma---they are very religious.
I told them we'll talk again on Friday.

rsp

*RANDY SUE POLLOCK*
Law Office of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, CA 94610
T 510-763-9967
F 510-380-6551
C 510-703-3370
www.rspollocklaw.com

# EXHIBIT E



Richard L. Wynne (Bar No. 120349)
richard.wynne@hoganlovells.com
Erin N. Brady (Bar No. 215038)
erin.brady@hoganlovells.com
Edward J. McNeilly (Bar No. 314588)
edward.mcneilly@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

*Attorneys for Creditor KS Mattson Partners, LP*

**The following constitutes the order of the Court.**
**Signed: December 15, 2025**

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SANTA ROSA DIVISION

| | |
|---|---|
| In re | Case No. 24-10714 CN |
| KENNETH W. MATTSON, | Chapter 7 |
| Debtor. | **ORDER GRANTING MOTION OF KS MATTSON PARTNERS, LP FOR RELIEF FROM AUTOMATIC STAY** |
| | Date: December 10, 2025<br>Time: 10:00 a.m. (Pacific Time)<br>Place: (In Person or Via Zoom)<br>United States Bankruptcy Court<br>1300 Clay Street, Courtroom 215<br>Oakland, CA 94612 |

Upon consideration of the *Motion of KS Mattson Partners, LP for Relief From the Automatic Stay* (the "Motion"),[1] filed by creditor KS Mattson Partners, LP ("KSMP"), the Court having reviewed the Motion, the Itkin Declaration and the Wellander Declaration, and the Court having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules"); (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion and the Hearing was sufficient under the circumstances; and (v) good cause exists to waive the requirements imposed by Bankruptcy Rule 4001(a), to the extent either is applicable; and after due deliberation the Court having determined that the relief requested is in the best interests of debtor Kenneth W. Mattson's ("Mattson") and its creditors, and good and sufficient cause having been shown:

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted.

2.      KSMP is hereby granted relief from the automatic stay to pursue, at its discretion, all remedies available under applicable law to regain possession of the property located at 3003 Castle Road, Sonoma, California 95476 from Kenneth W. Mattson, and to take any steps necessary to effectuate that recovery. Such steps may include, without limitation, serving notices and papers required under California real estate law, delivering a new lease, filing a turnover action in this Court, filing an unlawful detainer action in California state court, and taking related enforcement measures.

3.      Nothing in the Motion or this Order shall modify the automatic stay to permit KSMP to pursue a monetary judgment or recovery from Mattson for unpaid prepetition rent; however, KSMP shall have the right to assert and file a claim for such amounts in Mattson's bankruptcy

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2

case.

4. The fourteen-day stay prescribed by Bankruptcy Rule 4001(a)(4) is waived. The terms and provisions of this Order shall immediately be effective and enforceable upon entry of this Order.

5. KSMP is authorized to take all actions necessary to effectuate the relief provided in this Order.

6. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

***END OF ORDER***

Approved As to Form.

Dated: December 11, 2025

*/s/ Ruth Elin Auerbach*
RUTH ELIN AUERBACH (SBN 104191)
Law Office of Ruth Auerbach
236 West Portal Ave.
#185 San Francisco, CA 94127
Telephone: (415) 722-5596
Facsimile: (415) 349-4555
E-mail: Ruth.auerbach.esq@gmail.com

*Attorney for KENNETH W. MATTSON*

**COURT SERVICE LIST**

ECF Parties

Mail service will be handled by counsel.

# EXHIBIT F

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

## NOTICE OF CHANGE OF TERMS OF TENANCY
### (Except Changes in Monthly Rent)

TO:_____**Kenneth Mattson, Stacy Mattson**_____

*All Residents (tenants and subtenants) in possession (full name) and all others in possession*

of the premises located at:

**3003 Castle Rd**_____, Unit # (if applicable)_____

*(Street Address)*

_____**Sonoma**_____, CA ___**95476**_____.

*(City)*          *(Zip)*

You are hereby notified, in accordance with Civil Code Section 827, that 30 days after service upon you of this Notice, or

_____, whichever is later, the terms of your tenancy will be changed as follows:

*(Date)*

____The new terms of your Rental Agreement are attached._____

_____

_____

_____

_____

_____

_____

_____

Except as herein provided, all other terms of your tenancy shall remain in full force and effect.

As required by law, you are hereby notified that a negative credit report reflecting on your credit history may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

**KS Mattson Partners, LP**    ☒ by ⎸ *David Carlson* _____, **PURE Property Management**Agent for Landlord

**Landlord**                 *Individual Signing for Landlord*      **Management Co. (If Applicable)**

                        **David Carlson**

12/17/2025

**Date**

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-152** *– Revised 10/19 - ©2019 – All Rights Reserved*
*Page 1 of 2*

**Unauthorized Reproduction of Blank Forms is Illegal.**

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

# RENTAL AGREEMENT (Month-to-Month)

THIS AGREEMENT between_____KS Mattson Partners, LP_____"Landlord",
*(Name of Landlord)*

and _____Kenneth Mattson, Stacy Mattson_____"Resident"
*(List all Residents who will sign this Agreement)*

is effective when fully executed by all parties. The Owner's obligation to deliver possession to Resident is conditioned on Resident making all payments due at or prior to move-in under this Agreement.

The following definitions apply throughout this Agreement, except when these terms appear within quoted statutory language. In that case, the terms have the meaning intended by the law.

Premises means the entire property, i.e., the parcel of land and anything on it.

Building means the structure in which the Resident's unit is located.

Rental unit means the area to which the Resident has the exclusive right of possession.

THE PARTIES AGREE AS FOLLOWS:

1.  **RENTAL UNIT:** Subject to the terms and conditions of this Agreement, Landlord rents to Resident and Resident rents from Landlord for residential use only, the rental unit located at:

_____3003 Castle Rd_____, Unit # (if applicable),_____
*(Street Address)*

_____Sonoma_____CA, __95476_____.
*(City)*                                                                                                                       *(Zip)*

2.  **AB 1482 DISCLOSURES**:

    (a) ☒ **Separately Alienable From Any Other Dwelling Unit:**

    This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12(d)(5) and 1946.2(e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation.

    (b) ☐ **This Rental Unit's AB 1482 New Construction Exemption May Expire During This Tenancy:** AB 1482 exempts housing that has been issued a certificate of occupancy within the last 15 years.

    **The following disclosure is effective** _____.
    *(Date)*

    California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information.

[Continued on Next Page]

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** *– Revised 12/25 - ©2025 – All Rights Reserved*
Page **1** *of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**

(c) ☐ **Subject to AB 1482 rent caps and just cause as provided in Civil Code Section 1946.2 and 1947.12. The following disclosure is required by law.**

California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy.  See Section 1946.2 of the Civil Code for more information.

3. **TERM AND TERMINATION:**  The term of this Agreement is month-to-month. Except as prohibited by law, this Agreement may be terminated by Resident after service of a written 30-day notice of termination, in accordance with California law. Except as prohibited by law, this Agreement may be terminated by the Landlord by service upon the Resident of a written 60-day notice of termination. However, Civil Code Section 1946.1 provides that "if any tenant or resident has resided in the dwelling for less than one year", the Landlord may terminate this Agreement by service upon the Resident of a written 30-day notice.  Any holding over by the Resident after termination shall entitle the Landlord to initiate legal proceedings to recover possession of the rental unit. Resident shall be liable to Landlord for daily rental damages equal to the current fair rental value of the rental unit, divided by 30, in addition to any other damages allowed by law.

**For Rental Units subject to AB 1482 just cause**, Civil Code 1946.2(a) provides that "after a tenant has continuously and lawfully occupied a residential real property for 12 months, the owner of the residential real property shall not terminate the tenancy without just cause, which shall be stated in the written notice to terminate tenancy.  If any additional adult tenants are added to the lease before an existing tenant has continuously and lawfully occupied the residential real property for 24 months, then this subdivision shall only apply if either of the following are satisfied: (1) all of the tenants have continuously and lawfully occupied the residential real property for 12 months or more; or (2) one or more tenants have continuously and lawfully occupied the residential real property for 24 months or more."

**For rental units subject to just cause under state law,** "just cause" to terminate the tenancy includes termination "if the owner, or their spouse, domestic partner, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the residential real property."

4. **RENT:** Rent is due in advance on the ___first (1st)___ day of each and every month, at $ _20,000.00_____

per month.  Tenancy start date: ___January 20, 2026_____. Rent for any partial month shall be prorated at the amount of
    _(Date)_
1/30th of the monthly rent per day.

☐    Rental rate indicated above does not include the temporary rent payment discount, provided in attached temporary rent payment discount addendum.

**(a) Prorated Rent (if applicable)**

☒    ~~The tenancy did not start on the rent due date specified above~~. Resident is to pay the following prorated amounts; ~~which reflect the temporary rent payment discount indicated above, if applicable~~:

~~One month's rent at move-in: $~~ N/A_____.
    _(Full rent amount)_

Prorated rent of $ ____7,999.92_____ on ___January 20, 2026_____.
    _(Amount of prorated rent)_                    _(Date)_

The regular rent of $ _20,000.00_____, each month, beginning ___February 1, 2026_____.

[Continued on Next Page]

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** *– Revised 12/25 - ©2025 – All Rights Reserved*
*Page 2 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

**(b) Payment Methods for Rent and Other Amounts Due under This Agreement**

Payments made in person may be delivered between the hours of __8:00 AM__ and __5:00 PM__ on the following days of

the week: ☒ Monday ☒ Tuesday ☒ Wednesday ☒ Thursday ☒ Friday ☐ Saturday ☐ Sunday ☐ Other _____

Acceptable methods of payment:
☒ Personal Check ☒ Cashier's Check ☒ Money Order ☐ EFT/Credit Card (see Landlord for details) and ☐ Cash

**(c) Rent Payee and Location**

Rent is to be paid to _____ KS Mattson Partners, LP _____
*(Name to whom rent payment should be made)*

and is to be delivered to _____ Robbin Itkin _____
*(Name to whom rent should be delivered)*

at _____ Attn: Stapleton Group, 514 Via De La Valle, Ste 210, Solano Beach, CA 92075 _____
*(Address where payments should be delivered)*

Telephone number for above address: _____ 213-877-6806 _____

**(d) Payments** In the event of roommates, or another form of multiple occupancy, Resident understands and agrees that rent shall be paid with a single payment and that it is up to Resident to collect individual checks or other payments in order to submit a single rent payment. If payment by mail is allowed, Resident bears the risk of loss or delay of any payment made by mail and Landlord must receive mailed rent payments on or before the due date, except as otherwise provided by law. In the absence of a signed acknowledgement that complies with Civil Code 1947.3, Landlord will accept rent payments only from the Resident. Landlord may require a separate signed acknowledgement for each rent payment made by a third party. Rent tendered by a Non-Resident shall be deemed rent tendered on behalf of Resident only and not on behalf of the Non-Resident. Should the Landlord elect to accept a payment that does not comply with this paragraph, this shall not be construed as a waiver of this provision. If Resident pays online or by direct deposit, such payment shall be deemed to come from Resident regardless of the source of the payment. Payment online or by direct deposit may be rejected or returned by Landlord during the pendency of any legal action, or in anticipation of legal action. Failure or refusal by Resident to cash Landlord's rent refund check shall not defeat Landlord's rejection of the rent being refunded.

**(e) Change to Payment Method.** The Landlord may refuse certain payment methods listed in subparagraph (b) above, as the form of payment to cure a Notice to Pay Rent or Quit, Notice to Perform Conditions and/or Covenants or Quit, a check passed on insufficient funds or dishonored for any other reason, or a stopped payment and may refuse certain methods for future rent payments thereafter. Notwithstanding the provisions above, the Landlord may demand or require cash as the exclusive form of payment of rent or security deposit if the Resident has previously attempted to pay the Landlord with a check drawn on insufficient funds or the Resident has stopped payment on a check, draft, or money order. If the Landlord chooses to demand or require cash payment under these circumstances, the Landlord shall give the Resident a written notice stating that the payment instrument was dishonored and informing the Resident that the Resident shall pay in cash for a period determined by Landlord, not to exceed three months, and attach a copy of the dishonored instrument to the notice.

**5. SECURITY DEPOSIT:**

**(a) Security Deposit Collection**

Resident shall deposit with Landlord, as a security deposit, the sum of $__0.00__, as follows:

☒ prior to taking possession of the rental unit. **(If no box is checked, this provision applies)**.

☐ at the time this Agreement is signed.

In most cases, a security deposit collected on or after July 1, 2024 may not exceed an amount equal to one month's rent. However, a landlord who meets the following criteria may collect a security deposit in an amount equal to up to two months' rent: (1) the landlord is a natural person, qualifying family trust, or a limited liability corporation in which all members are natural persons; and, (2) the landlord owns no more than two residential rental properties that collectively include no more



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 3 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.


Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

than four dwelling units offered for rent.

## (b) Use of Security Deposit

Resident shall not use the security deposit to pay any month's rent. Under Civil Code 1950.5, the Landlord may withhold from the security deposit only such amounts as are reasonably necessary to remedy Resident defaults including, but not limited to, any of the following:

(i) The compensation of a landlord for a resident's default in the payment of rent.

(ii) The "repair of damages to the premises, exclusive of ordinary wear and tear", caused by the resident or by a guest or licensee of the resident.

(iii) The "cleaning of the premises upon termination of the tenancy necessary to return the unit to the same level of cleanliness" it was in at the inception of the tenancy.

(iv) To remedy future defaults by the resident in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear.

## (c) Disposition of Security Deposit at End of Tenancy

Except where a longer time is allowed by law, within 21 calendar days after Resident has vacated the rental unit Landlord shall furnish Resident a copy of an itemized statement indicating the basis for, and the amount of, any security deposit received and the disposition of the security deposit and shall return any remaining portion of the security deposit to the Resident.

Effective January 1, 2026, California law provides that any remaining portion of the security deposit and itemized disposition shall be returned in the following manner, unless the Landlord and all Residents agree otherwise:

(i) In the case of multiple Residents, the Landlord shall return the remainder of the security by a check made payable to all adult Residents on the Rental/Lease Agreement at the time the tenancy terminates and furnish the itemized disposition by personal delivery or first-class mail, postage prepaid, to any one of the adult Residents chosen by the Landlord. If a Resident terminates the tenancy pursuant to Section 1946.7, the Landlord may return the security in a manner other than by check made payable to all adult Residents if the Resident who terminated the tenancy pursuant to Section 1946.7 requests refund in another manner.

(ii) In the case of a single Resident on the Rental/Lease Agreement who paid security or rental payments electronically, the Landlord shall return the remainder of the security to a bank account or other financial institution designated by the Resident and furnish the itemized disposition by personal delivery or first-class mail, postage prepaid. In the event of a successor Landlord, the obligation to return the remainder of the security electronically shall apply only if the successor Landlord received rental payments electronically from the Resident.

(iii) In all other cases, the Landlord shall return the remainder of the security by a check made payable to the Resident and furnish the itemized disposition by personal delivery or first-class mail, postage prepaid.

***Security Deposit Refund Method.*** Any remaining portion of the security deposit shall be returned in the manner required by law except as otherwise mutually agreed in writing by all Residents and the Landlord as indicated below or pursuant to separate subsequent agreement:

**(If no box is checked, this provision applies).**

☐ in the form of a single check made out to the following individual Resident:_____.

☐ in the form of a single electronic payment to the following individual Resident _____
to a bank account or other financial institution designated by such Resident within a reasonable time after notification of either party's intention to terminate the tenancy or before the end of the lease term. Landlord reserves the right to issue payment by check in the event Resident fails to designate a valid bank account or other financial institution.

☐ by multiple checks, in equal portions to the following Residents:_____

_____

☐ by multiple electronic payments in equal portions to the following Residents
_____ to a bank account or other financial institution designated by such Residents within a reasonable time after notification of either party's intention to terminate the tenancy or before the end of the lease term. Landlord reserves the right to issue payment by check to any Resident who fails to designate a valid bank account or other financial institution.



*California Apartment Association Approved Form*
*www.caanet.org*
***Form CA-040*** *– Revised 12/25 - ©2025 – All Rights Reserved*
*Page 4 of 18*

Unauthorized Reproduction of
Blank Forms is Illegal.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

*Itemized Disposition Return Method.* The itemized disposition of the security deposit shall be returned in the manner required by law except as otherwise mutually agreed in writing by all Residents and the Landlord as indicated below or pursuant to separate subsequent agreement:

**(If no box is checked, default method under the law applies).**

☐ by mail to the following individual Resident _____.

☐ by e-mail to the following individual Resident _____ at the following email address:

_____

☐ by mail to the following multiple Residents _____

_____.

☐ by e-mail to multiple Residents as follows:

_____ at the following email address _____,

_____ at the following email address _____,

_____ at the following email address _____,

_____ at the following email address _____,

_____ at the following email address _____,

_____ at the following email address _____.

6. **UTILITIES:** Resident shall pay for all utilities, services and charges, if any, made payable by or based upon occupancy of

Resident, **except**: _____

Resident shall have the following utilities connected at all times during the tenancy (check as applicable):

☒Gas ☒Electric ☒Water ☒Trash ☐Sewer ☐Other: _____

**Disconnection of utilities due to non-payment is a material breach of this Agreement.** In the event the Resident breaches this Agreement and abandons the rental unit before the expiration of the term of this Agreement, Resident shall be responsible for the payment of all utilities, services and charges, if any, for the rental unit for the balance of rental term or period or until the rental unit is re-rented, subject to the Landlord's duty to make reasonable efforts to re-let the premises.

Resident shall not use common area utilities (such as water or electricity) for the Resident's personal use, without prior written permission from the Landlord. Resident may not run extension cords from any portion of the rental unit (including the interior of the rental unit as well as any patio, porch, deck, garage or other outdoor areas that Resident has the exclusive right of possession to) or the interior of the building to the exterior of the building or the rental unit for any purpose, without prior written permission from the landlord.

7. **LATE FEES AND INSUFFICIENT FUNDS:** If rent is paid after the ____third (3rd)____ of the month, there will be a

late charge of $__150.00__ assessed. This late charge does not establish a grace period. The parties agree that this late fee is presumed to be the amount of damage resulting from the late payment of rent. It would be impracticable or extremely difficult to fix the actual damage. This sum represents a reasonable endeavor by the Landlord to estimate fair average compensation for any loss that may be sustained as a result of late payment of rent. Failure to pay the fee is a material breach of this Agreement. Pursuant to California law, if Resident passes a check on insufficient funds, Resident will

be liable to Landlord for the amount of the check and a service charge of $__25.00__, not to exceed $25 for the first

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** *– Revised 12/25 - ©2025 – All Rights Reserved*
*Page 5 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

check passed on insufficient funds, and $ <u>35.00</u>, not to exceed $35 for each subsequent check passed on insufficient funds.

8.  **GUARANTEE:** Resident ☐ is ☒ is not required to have a Guarantor for the duration of Resident's tenancy. If no box is checked, Resident is <u>not</u> required to have a Guarantor. The Guarantor shall be liable for the rent and any damages, financial or physical, caused by the Resident, including any and all legal fees incurred by the Landlord in enforcing this Agreement.  If a Guarantor is required, this Agreement will not take effect unless a fully executed guarantor agreement is attached.

9.  **RENTAL UNIT AVAILABILITY:** In the event the rental unit is not available on the move-in date due to a prior Resident holding over, or other cause not within the control of Landlord, Resident's damages will be limited to a return of the security deposit, any holding or other deposits and any advance payment of rent.

10. **OCCUPANTS:** The rental unit shall be occupied only by the following named person(s):

| Kenneth Mattson | | Stacy Mattson | |
|---|---|---|---|
| *Name* | *Birthdate* | *Name* | *Birthdate* |
| *Name* | *Birthdate* | *Name* | *Birthdate* |
| *Name* | *Birthdate* | *Name* | *Birthdate* |

11. **GUEST(S):** Except as otherwise provided by prior written agreement, any person who is not listed as an Occupant on this Agreement is a Guest.  A Guest may not stay in the rental unit for more than <u>7</u> consecutive days, or a total of <u>14</u> days in a 12-month period. At the discretion of Landlord, Guest(s) who overstay this limit may be required to go through the application process, and if approved, may be required to sign a Rental/Lease Agreement. A guest who has not signed a Rental/Lease Agreement is not a "tenant who has lawfully occupied the premises" for the purpose of Civil Code 1946.2 and is not a "tenant" for the purpose of Civil Code Section 1947.12.  Resident is responsible for any violation of this Rental/Lease Agreement by Resident's Guests.

12. **SUBLETTING AND ASSIGNMENT:** No portion of the rental unit shall be sublet nor this Agreement assigned. Any attempted subletting or assignment by Resident shall, at the election of Landlord, be an irremediable breach of this Agreement and cause for immediate termination as provided herein and by law. Resident is prohibited from offering all or part of the rental unit for short-term rental, such as through AirBNB, VRBO or other such sites.  Any person who is not named as an Occupant in this Agreement or Resident who signed this Agreement, who occupies any portion of the rental unit, for any period of time whatsoever, for any compensation or consideration whatsoever (including, without limitation, the payment of money and/or trade and/or barter of other goods, services, or property occupancy rights) is not a Guest. This constitutes attempted subletting or assignment under this Agreement, and is, at the election of Landlord, irremediable breach of this Agreement and cause for immediate termination.

13. **DISCLOSURE OF PERSON OR ENTITY AUTHORIZED TO MANAGE THE PREMISES AND INFORMATION FOR SERVICE OF PROCESS AND NOTICES**: The following information is provided as required by California Civil Code Section 1962.

    **(a) Service of Process and Notices**

    Notices, demands, and service of process shall be delivered to the following person or entity, who is the *(check one)* ☒ Landlord ☐ Agent for service of process and notices:

    | KS Mattson Partners, LP | 213-877-6806 |
    |---|---|
    | *(Name of person or entity to whom documents should be delivered)* | *(Telephone number)* |

    at <u>Attn: Stapleton Group, 514 Via De La Valle, Ste 210, Solano Beach, CA 92075</u>
    *(Address where documents should be delivered)*

---

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 6 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

**(b) Person or Entity Authorized to Manage the Premises**

The following person or entity is authorized to manage the premises:

| | |
|---|---|
| PURE Property Management | 707-524-8380 |
| *(Name of person or entity authorized to manage the premises)* | *(Telephone number)* |

at _____1101 College Ave, Ste 140, Santa Rosa, CA 95404_____
*(Address of person or entity authorized to manage the premises)*

If a person or entity other than Landlord (identified at the beginning of this Agreement) is listed in this paragraph as a person or entity who is authorized to manage the premises, this means the Landlord has contracted with an agent to manage the premises on Landlord's behalf.  Unless otherwise specified in this Agreement, for any obligations Resident has to Landlord, Resident shall tender their performance to the agent identified in this paragraph as the person or entity authorized to manage the premises. For example, if Resident is required to seek Landlord's written permission before engaging in certain conduct, Resident shall seek such permission from the agent identified in this paragraph as the person or entity authorized to manage the premises.   The agent identified in this paragraph as the person or entity authorized to manage the premises is authorized to act for and on behalf of Landlord with respect to all of Landlord's obligations under this Agreement.

14. **RENTERS INSURANCE:** Resident's personal property is not insured by Landlord. Landlord recommends that Resident obtain coverage for Resident's personal property. Resident is not a co-insured and is expressly excluded from coverage under any insurance policy held by Landlord which is now in effect or becomes effective during the term of this Agreement.  A renter's liability insurance policy such as the one that may be required below, benefits both the Landlord and the Resident.

☒ Resident is encouraged but not required to obtain renters liability insurance.

☐ Resident is required to maintain renter's liability insurance for the benefit of the Landlord and the Resident throughout the duration of the tenancy as specified <u>below</u>. Resident must provide proof of such insurance to the Landlord on demand. Failure to comply with this requirement is a material violation of this Agreement.

(a) Coverage of at least $_____ in personal liability (bodily injury and property damage) for each occurrence.
(b) The rental unit listed above must be listed as the location of the Resident insured.
(c) Landlord and any person listed in Paragraph 13(b) must be listed as Certificate Holder (i.e., a person entitled to proof of insurance).
(d) The carrier must provide 30-days' notice of cancellation, non-renewal or material change in coverage to the Landlord and any person listed in Paragraph 13(b).
(e) Resident must obtain insurance:

☐ within 30 days of the inception of the tenancy.

☐ prior to occupancy.

☐ by _____.
   *(Date)*

15. **KEYS:** Resident has received ___1_____ sets of keys. If needed, additional keys may be requested from the Landlord. There may be a charge. Keys are the exclusive property of Landlord. All keys must be returned to Landlord when Resident vacates. Resident shall be charged for the cost of new locks and keys if all keys are not returned.  If any keys are lost or provided to any unauthorized occupant or non-Resident, Resident shall be liable for the entire cost of all key and lock replacement, at the discretion of Landlord, as required for the security of the premises and its occupants, except as provided by law. This may include the costs of re-keying the entire Premises if Landlord, at Landlord's sole discretion, deems such action is necessary. Resident should take care not to lock himself/herself out. If Landlord is required to assist any Resident in gaining entry to the premises, Resident may be assessed a charge for the actual costs, including out of pocket expenses, incurred by Landlord and Landlord may require Resident to contract with a professional locksmith, except as provided by law.

Charges for key and lock replacement and for lockouts are due 5 days from receipt of the invoice from the Landlord.

[Continued on Next Page]

---

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 7 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

**16. PARKING (CHECK ONE):**

☒ This Agreement does not provide for parking of any motor vehicle or motorcycle anywhere in or about the premises, including the driveway(s). **(If <u>no</u> box is checked, this provision applies.)**

☐ This property's policy with respect to parking and/or garage use is in the attached addendum.

☐ This property's policy with respect to parking and/or garage use is as follows:

Number of parking spaces assigned to Resident's rental unit _____. Only one passenger vehicle or motorcycle may be parked in each space. Resident shall only use assigned parking spaces and shall ensure that guests park only in unassigned areas or designated guest parking areas. Landlord may require Resident to move Resident's vehicle(s) and all personal property to another comparable Parking Space/Garage on the Property. Such a request is not a severance of a housing service, and Resident shall comply promptly. The Parking Space/Garage may not be sublet or assigned by Resident. Resident may not switch spaces with any other resident in the building, without prior written permission of Landlord.

Resident may not use any parking space for recreational vehicles, boats, busses, trailers or similar non-passenger vehicles. The parking area may not be used for storage without prior written permission. The Parking Space/Garage may be used for parking of vehicle(s) only. It may not be used for living, sleeping, eating, working, construction, growing plants or any other activity. Resident may not use any parking space to wash or repair vehicles, to change oil in vehicles or for any purpose other than parking.

Resident agrees to move the vehicle and cooperate fully with the Landlord so that any repairs or alterations to parking or other areas can be made in as expeditious and efficient a manner as possible. Resident is prohibited from parking in otherwise allowable areas of the parking area/Garage during the days and times designed by Landlord in an addendum to this Agreement for waste collection, street sweeping, or cleaning of the parking area/Garage.

Resident shall ensure that posted and designated fire zones or "No Parking" areas remain clear of vehicles at all times. Resident shall refrain from parking in unauthorized areas or in another resident's designated parking space. (Vehicles parked in unauthorized areas or in another resident's space may be towed away at the vehicle owner's expense.) Only currently registered vehicles may be parked on the property. Vehicles with PNO (Planned Nonoperation) status may not be parked or stored on the property. A vehicle that lacks an engine, transmission, wheels, tires, doors, windshield, or any other major part or equipment necessary to operate safely on the highways, is subject to tow under California Vehicle Code 22658. Vehicles parked in violation of local laws are subject to tow. Vehicles that are leaking fluids (e.g, oil, coolant, transmission fluid) may not be parked on the property. Any vehicle that is leaking fluids must be removed from the property immediately. Resident is responsible for the cost of cleaning and repair of any resulting damage from the leaked fluids.

**17. STORAGE POLICY (CHECK ONE):**

☒ No storage outside of the Resident's rental unit is authorized, permitted, or provided under this Agreement. Resident agrees to keep personal property inside Resident's rental unit unless Landlord has expressly agreed otherwise in writing in an addendum to this Agreement. Resident shall refrain from storing gasoline, cleaning solvent or other flammable liquids in the unit. **(If neither box is checked, this provision applies.)**

☐ Storage is allowed pursuant to the attached addendum.

**18. PERSONAL MICROMOBILITY DEVICES:** E-bikes, electric scooters, electric hoverboards or other personal micromobility devices may not be stored or charged on the premises, except as provided below.

As provided in Civil Code 1940.41 "[p]ersonal micromobility device" means a device with <u>both</u> of the following characteristics: (A) It is powered by the physical exertion of the rider or an electric motor; and (B) It is designed to transport one individual or one adult accompanied by up to three minors.

**(Landlord check applicable box)** If no box is checked, option (b) applies.

(a) ☐ The e-bike, electric scooter, electric hoverboard or other electric micromobility device may only be stored and/or charged in the designated storage area on the premises in compliance with Civil Code 1940.41 as provided in the attached addendum.

(b) ☐ Resident may, as required by Civil Code 1940.41, "[s]tor[e] and recharg[e] up to one personal micromobility device in



*California Apartment Association Approved Form*
*www.caanet.org*
*Form CA-040 – Revised 12/25 - ©2025 – All Rights Reserved*
*Page 8 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

their dwelling unit for each person occupying the unit if the personal micromobility device meets the requirements in subparagraphs (i) or (ii) below. If the device <u>only</u> meets subparagraph (iii) below, it may be stored, <u>but not charged</u> in the dwelling unit.

(i) The device is not powered by an electric motor.

(ii) The device complies with the following safety standards: (a) For e-bikes, UL 2849, the Standard for Electrical Systems for E-bikes, as recognized by the United States Consumer Product Safety Commission, or EN 15194, the European Standard for electrically powered assisted cycles (EPAC Bicycles) or (b) For e-scooters, UL 2272, the Standard for Electrical Systems for Personal E-Mobility Devices, as recognized by the United States Consumer Product Safety Commission, or EN 17128, the European Standard for personal light electric vehicles (PLEV).

(iii) The device is insured by Resident under an insurance policy covering storage of the device within the tenant's dwelling unit. Charging the device in the unit is prohibited if the device does not meet the safety standards in (ii) even if the device is insured by Resident as required by this subparagraph. Resident must provide proof of such insurance to the Landlord on demand.

Repair or maintenance of batteries and motors of personal micromobility devices is prohibited within the rental unit. However, a resident may change a flat tire or adjust the brakes on a personal micromobility device within the rental unit.

Notwithstanding the provisions above, any personal micromobility device must be stored in compliance with applicable fire code and in compliance with the Office of State Fire Marshal Information Bulletin 24-003 regarding lithium-ion battery safety, issued January 23, 2024, or any updated guidance issued by the Office of the State Fire Marshal regarding lithium-ion battery safety. The applicable bulletin is attached to this agreement.

19. **LANDSCAPING:** Resident shall promptly advise Landlord of any problems with the landscaping, including, but not limited to, dead grass, plants or tree limbs, insect infestations, discolored or yellowing foliage and insufficient irrigation or leaks. Resident may not delegate the responsibilities of this paragraph to any person, including a contractor or other landscaping professional. Resident may not alter the landscaping or engage in "personal agriculture" without Landlord's prior written permission. If Resident is responsible for maintaining landscaping, including sufficient watering, Resident shall perform this obligation in a manner consistent with state and local water use restrictions.

**(CHECK ONE)**

☐ Resident is not responsible for the upkeep of the yard and maintenance of the landscaping. **(If <u>no</u> box is checked, this provision applies.)**

☒ Resident is responsible for the upkeep of the yard and maintenance of the landscaping, including watering, mowing, weeding and clipping.

☐ Landscaping responsibilities are addressed in the attached Addendum.

20. **SMOKING POLICY:** Smoking of any substance, including marijuana, is prohibited everywhere on the premises, including in rental units and interior and exterior common areas, **unless** Landlord has adopted a different policy that is attached as an addendum to this Agreement. Smoking includes the use of e-cigarettes or vaping. The term "smoke" includes vapor from e-cigarettes or other vaping devices. (Check a box if an addendum is attached).

☐ This property's policy with respect to allowing smoking is in the attached addendum.

☐ This property is subject to a local non-smoking ordinance, which requires the attached addendum.

Resident shall inform his or her guest(s) of this Smoking Prohibition. Resident shall promptly notify Landlord in writing of any incident where smoke is migrating into Resident's rental unit from sources outside of Resident's rental unit. Resident acknowledges that Landlord's adoption of this policy, does not make the Landlord the guarantor of the Resident's health or of the smoke-free condition of the areas listed above. However, Landlord shall take reasonable steps to enforce this provision. Landlord shall not be required to take steps in response to smoking unless Landlord has actual knowledge or has been provided written notice. Landlord and Resident agree that the other residents of the premises are the third-party beneficiaries of this provision. A resident may sue another resident to enforce this provision but does not have the right to evict another resident. Any lawsuit between residents regarding this provision shall not create a presumption that the Landlord has breached this Agreement. A breach of this provision by the Resident shall be deemed a material breach of this Agreement and grounds for immediate termination of this Agreement by the Landlord.



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** *— Revised 12/25 - ©2025 — All Rights Reserved*
*Page 9 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



21. **PROHIBITIONS:** Without Landlord's prior written permission as an addendum to this Agreement, no pets, pianos, aquariums, waterbeds, swimming pools, trampolines, outside antennae, fireworks, firepits, outdoor gas heaters, charcoal or wood burners

or other open-flame cooking devices, or liquefied petroleum gas or electric fueled cooking devices ("grills") or

_____

_____

shall be kept or allowed in or about the premises, including any indoor or outdoor common areas.

Resident shall not engage in any of the actions or conduct related to marijuana, that are otherwise permitted under Health and Safety Code 11362.1, on the premises. This includes growing and use of marijuana in any form.

Resident shall refrain from shaking or hanging clothing, curtains, rugs, and other coverings and cloths outside of any window ledge or balcony. No clotheslines or drying racks may be used in outdoor areas, balconies, patios, etc. without the Landlord's prior written permission. Plants and other items may not be placed on balcony railings or ledges unless Landlord has expressly agreed otherwise in writing in an addendum to this Agreement.

22. **SECURITY DEVICES:** Resident may not install any security devices (including, but not limited to, security cameras and video doorbells) that capture any images and/or sounds outside the Resident's rental unit without Landlord's prior written consent, which may be granted or withheld in Landlord's sole discretion.

23. **LARGE APPLIANCES:** Resident shall not move or remove any large appliances provided by Landlord without prior written consent of the Landlord. Resident shall not install or operate any additional refrigerators, freezers, washing machines, clothes dryers, portable dishwashers, air conditioners, generators or other large appliances not provided by the Landlord, without prior written consent of the Landlord. Resident may operate a generator in emergency situations, provided that (1) all manufacturer safety procedures are followed, including operating the generator in an outside space and (2) the generator does not create a nuisance (noise or other) for other residents.

24. **REPAIRS AND ALTERATIONS:** Resident shall make a written request to Landlord regarding any repairs, decorations or alterations contemplated. Except as provided by law, no repairs, decorating or alterations shall be done by Resident without Landlord's prior written consent. This includes, but is not limited to, painting, wallpapering, and changing locks. Resident may not make any alterations to cable or telephone inside wiring (such as may occur when changing telecommunications providers or adding phone lines) without prior written consent of the Landlord. The consent request regarding proposed alterations to inside wiring shall include the name, address, and telephone number of any new telecommunications providers. Resident agrees to pay all costs resulting from the alteration and agrees to pay to the Landlord any costs associated with restoring the inside wiring to the condition at the time of move-in, except for reasonable wear and tear. Resident shall hold Landlord harmless and indemnify Landlord as to any mechanic's lien recordation or proceeding caused by Resident.

25. **UNLAWFUL ACTIVITIES:** Resident, Occupants and any guest or other persons under the Resident's control shall not

   (a) on or near the premises engage in any:
     (1) criminal activity, including drug-related criminal activity. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802)).
     (2) act intended to facilitate criminal activity, including drug-related criminal activity,
     (3) acts of violence or threats of violence, including, but not limited to the unlawful discharge of firearms
   (b) use the rental unit or premises or permit the rental unit or premises to be used by a person:
     (1) for, or to facilitate, criminal activity, including drug-related criminal activity, engage in the manufacture, sale, or distribution of illegal drugs at any location, whether on or near premises and property or otherwise.
     (2) for an unlawful purpose as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.
   (c) engage in any criminal activity or criminal threat (as defined in subdivision (a) of Section 422 of the Penal Code), on or off the premises, that is directed at any owner, Landlord, or agent of the owner or Landlord of the premises.

**A single violation of any of these provisions shall be deemed a serious and material violation of <u>this</u> Agreement. It is understood and agreed that a single violation shall be good cause for termination of this Agreement**. Unless otherwise provided by law, proof of violation shall not require criminal conviction but shall be by a preponderance of the evidence.

26. **SPARE THE AIR ALERTS:** Many Air Districts have enacted "Spare the Air" programs, which prohibit certain activities, which may include burning wood, pellets, or manufactured fire logs when a "Spare the Air" Alert is issued. A map of California Air Districts, with links to local information is available at: http://www.arb.ca.gov/capcoa/dismap.htm. Resident agrees that

---


*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** *– Revised 12/25 - ©2025 – All Rights Reserved*
*Page 10 of 18*


Unauthorized Reproduction of Blank Forms is Illegal.

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

Landlord may provide Resident's name and address to the regional Air District for the purpose of notifications and enforcement of the Spare the Air program. Nothing herein is deemed to be authorization of or consent by Landlord to burn anything that is not authorized by this Agreement. Resident shall

(a) obtain information about the restrictions specific to the District in which the premises are located.
(b) ensure that Resident is aware of "Spare the Air" days.
(c) comply with all "Spare the Air" restrictions.
(d) be responsible for any "Spare the Air" fines or other costs occasioned by "Spare the Air" violations on the premises while the Resident is in possession whether levied against Landlord or the Resident.

**27. POLITICAL SIGNS:** California law allows residents to post "political signs", subject to certain limitations. A "political sign" is one that relates to any of the following:

(a) An election or legislative vote, including an election of a candidate to public office.
(b) The initiative, referendum, or recall process.
(c) Issues that are before a public commission, public board, or elected local body for a vote.
(d) Resident may only post, display or install political signs in the window or door of the rental unit rented by Resident in a multi-family dwelling or in the case of a single-family home, from the yard, window, door, balcony, or outside wall of the premises rented by the Resident.
(e) Resident is prohibited from posting or displaying political signs that (1) are more than six square feet in size; (2) violate a local, state, or federal law; or (3) would violate a lawful provision in a common interest development governing document that satisfies the criteria of California Civil Code Section 1353.6.
(f) Resident shall post and remove political signs in compliance with the time limits set by the ordinance for the jurisdiction where the premises are located. Resident shall be solely responsible for any violation of a local ordinance. If no local ordinance exists or if the local ordinance does not include a time limit for posting and removing political signs on private property, political signs may be posted 90 days prior to the date of the election or vote to which the sign relates and must be removed 15 days following the date of the election or vote.

**A breach of this provision by the Resident shall be deemed a material breach of this Agreement and grounds for termination of the Agreement by the Landlord.**

**28. SATELLITE DISHES**
Resident agrees to comply with all of the following restrictions with respect to any satellite dish installed at the premises:
(a) **Size:** A satellite dish may not exceed 39 inches (1 meter) in diameter. An antenna or dish may receive but not transmit signals;
(b) **Location:** A satellite dish or antenna may only be located inside Resident's rental unit, including in an outside area of the rental unit such as Resident's balcony, patio, yard, etc., of which Resident has exclusive use under this Agreement. Installation is not permitted on any parking area, roof, exterior wall, window, fence or common area, or in an area that other Residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is rented to Resident for Resident's exclusive use. Permitted locations may not provide optimum signal. Landlord is not required to provide alternate locations if allowable locations are not suitable;
(c) **Safety and Non-Interference:** Satellite dish/antenna installation: (1) must comply with reasonable safety standards; (2) may not interfere with Landlord's cable, telephone or electrical systems or those of neighboring properties. It may not be connected to Landlord's telecommunication systems and may not be connected to Landlord's electrical system except by plugging into a 110-volt duplex receptacle;
(d) **Outside Installation:** If a satellite dish or antenna is placed in a permitted outside area of the rental unit, it must be safely secured by one of three methods: (1) securely attaching to a portable, heavy object; (2) clamping it to a part of the building's exterior that lies within Resident's rental unit (such as a balcony or patio railing) or (3) any other method approved by Landlord. No other methods are allowed. Landlord may require that Resident block a satellite dish or antenna with plants, etc., so long as it does not impair Resident's reception.
(e) **Signal Transmission from Outside Installation:** If a satellite dish or antenna is installed in a permitted outside area of the rental unit, signals may be transmitted to the interior of Resident's rental unit only by: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); or (3) any other method approved by Landlord;
(f) **Installation and Workmanship:** For safety purposes, Resident must obtain Landlord's approval of (1) the strength and type of materials to be used for installation and (2) the person or company who will perform the installation. Installation must be done by a qualified person or a company that has workers' compensation insurance and adequate public liability insurance. Landlord's approval will not be unreasonably withheld. Resident must obtain any permits required by local ordinances for the installation and must comply with any applicable local ordinances and state laws. Resident may not


*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 11 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**


Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

damage or alter the premises and may not drill holes through outside walls, door jams, window sills, etc., to install a satellite dish, antenna, and related equipment;

(g) **Maintenance:** Resident will have the sole responsibility for maintaining a satellite dish or antenna and all related equipment. Landlord may temporarily remove any satellite dish or antenna if necessary, to make repairs to the premises;

(h) **Removal and Damages:** Any satellite dish, antenna, and all related equipment must be removed by the Resident when Resident moves out of the rental unit. Resident must pay for any damages and for the cost of repairs or repainting that may be reasonably necessary to restore the premises to its condition prior to the installation of a satellite dish or antenna and related equipment;

(i) **When Resident may begin Installation:** Resident may start installation of a satellite dish or antenna only after Resident has provided Landlord with written evidence of the liability insurance required by this Agreement, if applicable and received Landlord's written approval of the installation materials and the person or company who will do the installation.

## 29. WATER CONSERVATION:
The State Water Resources Control Board prohibits all Californians from: washing down driveways and sidewalks; watering of outdoor landscapes that cause excess runoff; using a hose to wash a motor vehicle, unless the hose is fitted with a shut-off nozzle; and using potable water in a fountain or decorative water feature, unless the water is recirculated. Many local water boards also have restrictions. Local information is available at: https://www.acwa.com/drought-response/. Landlord may provide Resident's name and address to the local water agency for the purpose of notifications and enforcement of water use restrictions. Nothing herein is deemed to be authorization of or consent by Landlord to water usage not otherwise authorized by this Agreement. Resident shall ensure that he/she is aware of and complies with local and state water use water use restrictions and pay any fines or other costs occasioned by water usage violations attributed to Resident's tenancy or the conduct of Resident, Resident's guests, or others at the premises, including any fines or costs levied against the Landlord.

## 30. ENTRY AND COOPERATION:
California law allows Landlord or their employee(s) to enter the rental unit for certain purposes, generally during normal business hours. The Landlord will provide written notice to the Resident prior to the entry of the rental unit whenever required by state law.

**The Resident's refusal to allow the landlord to enter the rental unit as allowed by law is a material breach of this Agreement and California law and is cause for termination as provided herein and by law.**

If the premises is required by any government agency, lender or insurer to undergo repairs or alterations, or in case of other necessary or agreed repairs, Resident agrees to cooperate fully with Landlord so that all such repairs or alterations are made in as expeditious and efficient a manner as possible.

## 31. BED BUG INFORMATION, REPORTING, PREVENTION AND RESIDENT COOPERATION:
The Landlord has inspected the rental unit prior to renting and knows of no bed bug infestation. Resident agrees not to bring onto the premises personal furnishings or belongings that the Resident knows or should reasonably know are infested with bed bugs, including the personal property of the Resident's guests. Residents have an important role in preventing and controlling bed bugs. While the presence of bed bugs is not always related to personal cleanliness or housekeeping, good housekeeping can assist with early detection and make bed bug control easier if it is necessary. Please review the short interactive video at www.stopbedbugs.org and the information below.

(a) **Information about Bed Bugs:**
- **Bed bug appearance:** Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.
- **Life cycle and reproduction:** An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days.
- Bed bugs can survive for months without feeding.
- **Bed bug bites:** Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.
- **Common signs and symptoms** of a possible bed bug infestation:
  - Small red to reddish brown fecal spots on mattresses, box springs, bed frames, licnens, upholstery, or walls.
  - Molted bed bug skins, white, sticky eggs, or empty eggshells.
  - Very heavily infested areas may have a characteristically sweet odor.

---



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 12 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.



> ➤ Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.

- For more information, see the Internet Websites of the United States Environmental Protection Agency and the National Pest Management Association.
  - ➤ http://www2.epa.gov/bedbugs
  - ➤ http://www.pestworld.org/all-things-bed-bugs/

**(b) Report Suspected Bed Bug Infestations As Soon as Possible**
- **Prompt reporting:  If you find or suspect a bed bug infestation, please notify Landlord as soon as possible**, and describe any signs of infestation, so that the problem can be addressed promptly.  Please do not wait.  Even a few bugs can rapidly multiply to create a major infestation that can spread from unit to unit.
- **Report any maintenance needs immediately.** Bed bugs like cracks, crevices, holes, and other openings. Request that all openings be sealed to prevent the movement of bed bugs from room to room.

- If you suspect a bed bug infestation, or have other maintenance needs, please provide your notice to:

  PURE Property Management, 1101 College Ave, Ste 140, Santa Rosa, CA 95404

  707-524-8380, northbay@rentpure.com

**(c) Cooperation with Pest Control**
- Residents shall cooperate with the inspection including allowing entry to inspect any rental unit selected by the pest control operator until bed bugs have been eliminated and providing to the pest control operator information that is necessary to facilitate the detection and treatment of bed bugs.
- Prior to treatment, affected Residents will receive a written notice including the date(s) and time(s) of treatment, whether and when the Resident is required to be absent from the rental unit, the deadline for any Resident preparation of the rental unit and a pretreatment checklist with information provided by the pest control operator.
- The Resident shall fulfill his or her responsibilities for rental unit preparation before the scheduled treatment, as described in the pest control operator's pretreatment checklist.
- Residents shall be responsible for the management of their belongings, including, but not limited to, clothing and personal furnishings.
- If the pest control operator determines that it is necessary for a Landlord or Resident to dispose of items infested with bed bugs, the items shall be securely sealed in a bag that are of a size as to readily contain the disposed material. Bags shall be furnished as needed to Residents by the property owner or pest control operator. All bags shall be clearly labeled as being infested with bed bugs prior to disposal.
- Residents who are not able to fulfill their rental unit preparation responsibilities shall notify the Landlord at least one business day prior to the scheduled pest control operator visit for inspection or treatment.
- A Resident must vacate his or her rental unit if required by the pest control operator for treatment purposes and shall not reenter the rental unit until directed by the pest control operator to do so.

**(d) Prevention Recommendations**
- Resident should check for hitch-hiking bed bugs. If you stay in a hotel or another home, inspect your clothing, luggage, shoes, and belongings for signs of bed bugs *before* you enter your home. Check backpacks, shoes, and clothing after visits to friends or family, theaters, or after using public transportation. Thoroughly clean after guests have departed. Immediately after your guests leave, seal bed linens in plastic bags, until they can be washed and dried on high heat.  After your guests have departed, inspect bedding, mattresses and box springs, behind headboards, carpet edges and the undersides of sofa cushions for signs of bed bugs.
- Resident should avoid using appliances, electronics and furnishings that have not been thoroughly inspected for the presence of bed bugs.  Make sure that the electronics, appliance, or furniture company has established procedures for the inspection and identification of bed bugs or other pests.  This process should include inspection of trucks used to transport appliances, electronics, or furniture. Never accept an item that shows signs of bed bugs. Check secondhand furniture, beds, and couches for any signs of bed bug infestation before bringing them home. Never take discarded items from the curbside.
- Use a protective cover that encases mattresses and box springs and eliminates many hiding spots. The light color of the encasement makes bed bugs easier to see. Be sure to purchase a high-quality bed bug encasement that will resist tearing and check the encasements regularly for holes.
- Reduce clutter in your home to reduce hiding places for bed bugs and vacuum frequently to remove successful hitch hikers.



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040 –** *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 13 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

- Be vigilant when using shared laundry facilities. Transport items to be washed in plastic bags (if you have an active infestation, use a new bag for the journey home). Remove from dryer directly into bag and fold at home. (A dryer on high heat can kill bed bugs.)

**32. CARE, CLEANING AND MAINTENANCE:** Except as prohibited by law, Resident agrees
(a) to keep the premises as clean and sanitary as their condition permits and to dispose of all rubbish, garbage and other waste, in a clean and sanitary manner, unless Landlord has expressly agreed otherwise in writing in an addendum to this Agreement. Resident shall ensure that large boxes are broken apart before being placed in trash containers. Resident shall be responsible, at Resident's expense, for hauling to the dump those items too large to fit in the trash containers. Resident shall not dispose of any flammable liquids, rags or other items soaked with flammable liquids or any other hazardous material (such as lithium ion batteries) in trash containers or bins;
(b) to properly use and operate all electrical, gas and plumbing fixtures and keep them as clean and sanitary as their condition permits;
(c) to keep the rental unit and furniture, furnishings and appliances, and fixtures, which are rented for Resident's exclusive use, in good order and condition;
(d) that all rooms, appliances and fixtures in the rental unit must be able to be used for their intended purpose(s);
(e) not to willfully or wantonly destroy, deface, damage, impair or remove any part of the premises, the facilities, equipment, or appurtenances thereto or to permit any person on the premises, to do any such thing;
(f) to occupy the rental unit as a residence, utilizing portions thereof for living, sleeping, cooking or dining purposes only which were respectively designed or intended to be used for such purposes;
(g) to promptly advise Landlord of any items requiring repair, such as locks or light switches, smoke detectors, appliances, heating and air conditioning (if provided) systems. Resident shall notify the Landlord of any leaks, drips, water fixtures that do not shut off properly, including, but not limited to, a toilet, or other problems with the water system, including, but not limited to, problems with water-saving devices. Resident shall make repair requests as soon after the defect is noted as is practical;
(h) to keep doors and windows and access to them unobstructed and to not block them with personal items or otherwise, and to maintain clear pathways into and through each room in the rental unit.
(i) to maintain the rental unit in a manner that allows necessary access through each room and to all doors and windows, does not inhibit necessary airflow, does not act as a potential haven for pests and mold growth, does not create a fire hazard, and allows rooms to be used for their intended purposes.
(j) to leave the premises in the same condition as it was received, subject to normal wear and tear, as its condition permits;
(k) to return the premises, upon move-out to the same level of cleanliness it was in at the inception of the tenancy;
(l) to pay Landlord for costs to repair, replace or rebuild any portion of the premises damaged by the Resident, Resident's guests or invitees.

**33. MOLD PREVENTION:** Resident agrees to:
(a) Keep the rental unit maintained and ventilated so that moisture does not accumulate. If moisture is allowed to accumulate in the unit, it can cause mildew and mold to grow;
(b) To immediately notify the Landlord of any dampness or mold problems including (1) any leaks, moisture problems, and/or mold growth; (2) any water intrusion, such as plumbing leaks, drips, or "sweating" pipes, or overflows from bathroom, kitchen, or unit laundry facilities, especially in cases where the overflow may have permeated walls or cabinets; and (3) any significant mold growth on surfaces inside the rental unit;
(c) To regularly allow air to circulate in the rental unit and to use exhaust fans (if available) whenever showering or bathing, cooking, dishwashing, or cleaning and to report to the Landlord any non-working fan;
(d) To use all reasonable care to close all windows and other openings to prevent water from coming into the interior of the rental unit;
(e) To clean and dry any visible moisture on windows, walls, and other surfaces, including personal property, as soon as reasonably possible (mold can grow on damp surfaces within 24 to 48 hours); and,
(f) To keep the rental unit free of dirt and debris that can harbor mold.

**34. PLUMBING:** Costs of repair or clearance of stoppages in waste pipes or drains, water pipes or plumbing fixtures caused by Resident's negligence or improper usage are the responsibility of the Resident. Resident shall reimburse Landlord for these costs.

**35. USE OF PREMISES:** The rental unit shall be used as a dwelling for residential purposes only and for no other reason. No retail, commercial, or professional use of the premises shall be made, unless such use conforms to applicable zoning laws and the prior written consent of Landlord is obtained in advance of such proposed use. As a condition for granting such permission, Landlord may require that Resident obtain liability insurance for the benefit of Landlord.

**36. QUIET ENJOYMENT, WASTE AND NUISANCE:** Resident and Resident's guest(s) shall not violate any criminal or civil law, ordinance or statute in the use and occupancy of the premises, commit waste or nuisance, annoy, molest or interfere with any

---



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 14 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

other person on the premises or neighboring property. Any such action may result in the immediate termination of this Agreement as provided herein and by law. Resident shall refrain from creating, or allowing to be created, any noise that is disturbing to other residents or with any other person on the premises or neighboring property. Resident is also responsible for compliance with any local noise ordinances.

37. **SMOKE DETECTION DEVICE:** The rental unit is equipped with a smoke detection device(s), which was tested and found operable by the Landlord. Landlord shall have a right to enter the rental unit to check and maintain the device as provided by law. Resident shall:
    (a) be responsible for performing the manufacturer's recommended test of the device weekly;
    (b) inform the Landlord immediately in writing of any defect, malfunction, or failure of any detector, and of any problems, maintenance or need for repairs to Landlord.
    (c) not disable, disconnect or remove the detector.

38. **CARBON MONOXIDE DETECTION DEVICE:** If the rental unit is equipped with a carbon monoxide detection device(s), the devices have been tested and found operable by the Landlord. Landlord shall have a right to enter the rental unit to check and maintain the device as provided by law.  Resident shall:
    (a) be responsible for performing the manufacturer's recommended test of the device weekly;
    (b) inform the Landlord immediately in writing of any defect, malfunction, or failure of any detector, and of any problems, maintenance or need for repairs to Landlord.
    (c) not disable, disconnect or remove the detector.

39. **LIABILITY FOR PACKAGES:** Landlord is not responsible for the delivery, acceptance or receipt of, damage to or loss of messages, packages, mail or other material left at entrances to the rental unit or elsewhere on the premises.

40. **LIABILITY FOR DAMAGES, FINES, AND PENALTIES:**
    (a) **Damages, Repair and Replacement:** Resident shall pay Landlord for costs to repair, replace or rebuild any portion of the premises damaged by the Resident, Resident's guests or invitee.  Payment is due 5 days from receipt of the invoice from the Landlord.  This includes but is not limited to charges assessed under paragraphs 15 (Keys); 18 (Landscaping); 22 (Repairs and Alternations); 26 (Satellite Dishes); 30 (Care, Cleaning and Maintenance); and 32 (Plumbing).

    (b) **Fines, Penalties and Other Costs:**  Resident is responsible for any fines or other costs occasioned by violations of the law by Resident or Resident's guests on the premises while Resident is in possession.  This includes but is not limited to charges assessed under paragraphs 16 (Parking), 24 (Spare the Air Alerts); and 27 (Water Conservation).   If any such fines or costs are levied against Landlord, Resident agrees to pay such fines or costs attributed to Resident's tenancy or the conduct of Resident, Resident's guests or others at the premises, upon receipt of an invoice from Landlord. The obligation to pay fines and costs assessed against Landlord may be in addition to any assessed directly against Resident. In the event that Landlord has already paid fines or costs levied against Landlord, Resident shall reimburse Landlord for the entire sum paid, within five (5) days of Landlord's written demand.  The obligation to pay fines and costs assessed against Landlord may be in addition to any assessed directly against Resident.

41. **JOINT AND SEVERAL LIABILITY:** The undersigned Resident(s), whether or not in actual possession of the rental unit, are jointly and severally liable for all obligations under this Agreement and shall indemnify Landlord for liability arising prior to the return of possession to the Landlord for personal injuries or property damage caused or permitted by Resident(s), their guests, and invitees. This does not waive "Landlord's duty of care" to prevent personal injury or property damage where that duty is imposed by law.

42. **SALE OF PROPERTY:** In the event of the sale or refinance of the rental unit, if Landlord presents to Resident Form CA-160 - *Resident's Certification of Terms - Estoppel Certification*, or other similar form, Resident agrees to execute and deliver the form acknowledging that this Agreement is unmodified and in full force and effect, or in full force and effect as modified with the consent of Landlord, and stating the modifications, within ten (10) days of written notice. Failure to comply shall be deemed Resident's acknowledgement that the form as submitted by Landlord is true and correct and may be relied upon by any lender or purchaser.

43. **DESTRUCTION OF OR DAMAGE TO THE RENTAL UNIT:** In the event the rental unit is partially or totally damaged or destroyed by fire or other cause, the following will apply:
    (a) If the rental unit is totally destroyed by fire, earthquake or other casualty, this Agreement will terminate, as of the date on which the damage occurs.  However, if the damage or destruction is the result of the negligence of the Resident, or his or her invitees, then the Agreement will not terminate, unless notice is given by the Landlord, specifying the termination date.

    (b) If the rental unit is only partially damaged, or are temporarily uninhabitable, as determined by Landlord, Landlord will use due diligence to begin the process to repair such damage and restore the rental unit as soon as possible. If only part of



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 15 of 18*

Unauthorized Reproduction of Blank Forms is Illegal.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

the rental unit cannot be used, there will be a proportionate rent discount until the rental unit is repaired, to be determined solely by Landlord.

**44. NOTICE REGARDING SEX OFFENDER DATABASE AND WEBSITE:** Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**45. HAZARD NOTICE:** Pursuant to Government Code Section 8589.45, Resident may obtain information about hazards, including flood hazards, that may affect the property from the Internet Web site of the Office of Emergency Services at http://myhazards.caloes.ca.gov/. The Landlord's insurance does not cover the loss of the Resident's personal possessions and it is recommended that the Resident consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to fire, flood, or other risk of loss. The Landlord is not required to provide additional information concerning the flood hazards to the property and the information provided pursuant to this section is deemed adequate to inform the Resident.

☐(Check box if applicable) The property is located in a special flood hazard area or an area of potential flooding.

**46. ASBESTOS:** This provision does not apply to rental units built after 1981.

☐ (Check box if applicable) This rental unit was built before 1981

Resident is prohibited from drilling, sanding, grinding, painting or breaking into any walls, floors or ceilings. Resident shall not install fixtures, hooks or other hanging objects from ceilings, walls or floors of the rental unit, except the resident may hang pictures and wall ornaments with hanging devices/hardware that are no more than ¼ inch in diameter, unless otherwise prohibited by this Agreement.

Resident shall notify Landlord immediately, if Resident becomes aware of any hole in a wall larger than ¼ inch in diameter, evidence of a water leak, crumbling or peeling of walls or ceilings and any other damage or disturbance of building materials in the rental unit.

(Landlord check one box):
☐ (a) This rental unit may contain asbestos due to its age.
OR
☐ (b) This rental unit is  known to contain asbestos (explain)
_____.

_____.

**47. ATTORNEYS' FEES:** If any legal action or proceeding is brought by either party to enforce any part of this Agreement, each party shall be responsible for their own attorneys' fees, unless the following box is checked:

☐ the prevailing party shall recover, in addition to all other relief, attorneys' fees not to exceed $_____, plus court costs. If the box is checked and no amount is filled in, the prevailing party's attorney fee recovery is not to exceed $800.

**47. CREDIT REPORTS:** A negative credit report reflecting on your credit history may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. Resident expressly authorizes Landlord (including a collection agency used by the Landlord) to obtain Resident's consumer credit report, which Landlord may use if attempting to collect past due rent payments, late fees, or other charges from Resident, both during the term of the Agreement and thereafter.

**48. SUBSTANTIAL OR MATERIAL BREACH:** The characterization in this Agreement that the failure of the resident to comply with a particular provision of this Agreement is a substantial or a material breach of the Agreement shall not serve to limit Landlord's right to contend that other breaches of this Agreement are substantial, material, or sufficient to warrant the termination of resident's tenancy.

**49. WAIVER OF BREACH:** The waiver by either party of any breach shall not be construed to be a continuing waiver of any subsequent breach. The receipt by Landlord of the rent with the knowledge of any violation of a covenant or condition of this agreement shall not be deemed a waiver of such breach. No waiver by either party of the provisions herein shall be deemed to have been made unless expressed in writing and signed by all parties to this Agreement.



*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040 –** *Revised 12/25 - ©2025 – All Rights Reserved*
*Page 16 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**



Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 110 of 129

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

**50. SEVERABILITY CLAUSE:** If any provision of this Agreement is held illegal or unenforceable in a judicial proceeding, such provision shall be severed and shall be inoperative, and the remainder of this Agreement shall remain operative and binding on the Parties.

**51. ENTIRE AGREEMENT:** This Agreement, which includes all attachments referred to above, constitutes the entire Agreement between the parties and cannot be modified except in writing and signed by all parties, except as permitted by applicable law. Neither Landlord, nor any agent or employee of Landlord has made any representations or promises other than those set forth herein.

**52. ADDENDA:** By initialing as provided below, Resident(s) acknowledge receipt of the following applicable addenda (as checked), copies of which are attached hereto and are incorporated as part of this Agreement.

      ✓ **CA-335 Information on Dampness and Mold for Renters in California**
          ✓ **CA-341 Fire Marshal Information Bulletin**

| | |
|---|---|
| ☐ Asbestos Addendum (Form CA-061) | ☐ Pet Addendum (Form CA-080) |
| ☐ CC&Rs Addendum (Form CA-067) | ☐ Pool/Spa Rules Addendum (Form CA-082) |
| ☐ Clothesline/Drying Rack Addendum (Form CA-066) | ☐ Proposition 65 Warning Addendum (Form CA-083) |
| ☐ Day Care Addendum (Form CA-068) | ☐ Smoking Policy Addendum (Form CA-088) |
| ☐ Grilling Addendum (Form CA-070) | ☐ Storage Addendum (Form CA-090) |
| ☐ Guarantee of Rental/Lease Agreement (Form CA-019) | ☐ Temporary Rent Discount Addendum (Form CA-100) |
| ☐ Lead-Based Paint Addendum (Form CA-071) | ☐ Third-Party Payor Agreement (Form CA-020) |
| ☐ Lead Brochure: Protect Your Family (Form CA-072) | ☐ Trash and Recycling Policy Addendum (Form CA-098) |
| ☐ Parking/Garage Addendum (Form CA-076) | ☐ Water Submetering Addendum (Form CA-093) |
| ☐ Periodic Application by Pest Control Operator Addendum (Form CA-078) | ☐ Waterbed Addendum (Form CA-094) |
| ☐ Periodic Application of Pesticides by Landlord Addendum (Form CA-077) | ☐ Other: |
| ☐ Personal Agriculture Addendum (Form CA-079) | |
| ☐ Personal Micromobility Device Storage Addendum (Form CA-102) | |

Resident(s) initials here: _____

[Continued on Next Page]


**Unauthorized Reproduction of Blank Forms is Illegal.**



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

**The Landlord is committed to compliance with all federal, state, and local fair housing laws.**

The undersigned Resident(s) acknowledge(s) having read and understood the foregoing, and receipt of a duplicate original.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| *Date* | *Resident* | *Date* | *Resident* |
| _____ | _____ | _____ | _____ |
| *Date* | *Resident* | *Date* | *Resident* |
| _____ | _____ | _____ | _____ |
| *Date* | *Resident* | *Date* | *Resident* |

KS Mattson Partners, LP ☒ by — DocuSigned by: *David Carlson* _____, PURE Property Management  Agent for Landlord

*Landlord*  *Individual Signing for Landlord*  *Management Co. (If Applicable)*

David Carlson

12/17/2025

*Date*

_____ ☐ by _____, _____ Agent for Landlord

*Landlord*  *Individual Signing for Landlord*  *Management Co. (If Applicable)*

_____

*Date*

*California Apartment Association Approved Form*
*www.caanet.org*
**Form CA-040** – *Revised 12/25 - ©2025* – *All Rights Reserved*
*Page 18 of 18*

**Unauthorized Reproduction of Blank Forms is Illegal.**


Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831



# Information on Dampness and Mold for Renters in California

## Main points:

- Living in damp or moldy buildings increases the chances of respiratory problems like asthma.

- The critical warning signs are visible mold, water damage, damp materials, or mold smell.

- Dampness is needed for mold to grow, so if you control the dampness, you control the mold.

- Dampness or mold indoors may make housing substandard, per the California Health & Safety Code.



Beginning January 1, 2022, residential landlords shall provide this booklet to prospective residential tenants prior to entering the rental or lease agreement, in accordance with the 2001 Toxic Mold Protection Act (HSC #26148). This booklet, which explains the potential health risks and health impacts that may result from exposure to mold, was produced by the California Department of Public Health (CDPH) in 2020, in both English and Spanish versions.

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

# Health Problems from Damp or Moldy Buildings

# Signs of Dampness or Mold

Living or working in damp or moldy buildings increases the risk of many harmful health problems, including:

- asthma attacks in people who already have asthma

- a new asthma diagnosis

- respiratory infections, such as bronchitis

- breathing symptoms, such as hay fever, sneezing, stuffy nose, sore throat, wheezing, breathing difficulty, or cough

- eczema or skin rash

Mold can affect people differently. How much a person is affected depends on how sensitive they are and on how much they are exposed. Damp or moldy buildings are linked to health problems in people even if they do not have allergies.

Signs of dampness or mold that may cause health problems include:

- **visible mold** (regardless of color), such as on walls or ceilings, behind furniture or appliances, under carpets, or even hidden in areas not seen in the occupied areas of homes

- **mold odor**, noticed as an earthy, musty, or moldy smell

- **visible water damage**, such as water-stains or discoloration on walls or ceilings, peeling or bubbled paint, warped floors, or rotting wood

- **damp or moist materials**, including condensation on windows or walls

Any one of these signs indicates increased risks to health, and the more that any of them are present, the greater the risk of health problems. Tests that identify the types of mold or the amounts of mold in buildings are not useful in telling us about the health risks. This is *why CDPH does not recommend testing for mold, such as measuring mold spores in the air*.



CDPH

Case: 26-01003    Doc# 1    Filed: 02/25/26    Entered: 02/25/26 20:36:54    Page 114 of 129

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

## Causes of Building Dampness that Can Allow Mold to Grow

The dampness that is necessary for indoor mold to grow can come from either inside or outside a building.

**Indoor sources include:**
- leaking or burst water pipes, for instance under sinks inside walls
- not enough venting to the outside by open windows or exhaust fans in places where water is used or moisture is produced (for example, bathrooms, laundry areas, kitchens, and water heaters)
- condensation (water droplets) on cold surfaces, including windows

**Outdoor sources include:**
- water coming in through leaky roofs or poorly-sealed windows, or from flooding
- damp, exposed dirt in crawl spaces
- outdoor surfaces that slope and drain water toward a building, including from a downspout





## Fixing Dampness and Mold Problems

The California Health & Safety Code (HSC §17920.3) says that when dampness or visible mold (or certain other conditions) in a home is a hazard to the health of occupants, the home is *substandard* and the property owner must fix the conditions. The Code excludes mold that is "minor and found on surfaces that accumulate moisture as part of their properly functioning and intended use."

CDPH recommends fixing dampness and mold problems as follows:

- identifying and correcting the source of any water that may allow mold to grow
- rapid drying or removal of damp materials
- cleaning or removing mold and moldy materials as rapidly and safely as possible

Note: if a moldy area is simply bleached, cleaned, or painted over—without fixing the source of the dampness—the mold is likely to grow again.



Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831

## Renters in California

The California Health & Safety Code requires property owners to provide a rental unit that is safe and healthy for the people living in it. Prospective renters should look for obvious conditions that show dampness or mold, and also less obvious signs like water leaks under the kitchen and bathroom sinks or moldy odor in a sealed-up home. Also look for conditions likely to cause future problems, like a bathroom that has no working vent fan or no window that opens, or a clothes dryer without an outside vent.

For renters who suspect there is dampness or mold:

1. Tell the property owner or manager. Early detection and correction of the dampness and mold problems can reduce the risks to your health and prevent the problem from getting worse.

2. If your property owner will not respond to your concerns in a reasonable amount of time, contact your local (city or county) code enforcement agency and ask for a code enforcement officer to inspect for violations. Many dampness or mold problems in rental homes are the responsibility of the property owner and must be addressed by them. However, a code enforcement officer may determine that dampness or mold in a building results from a tenant's actions or inactions – for instance, not using available bathroom ventilation during showers.

3. If the local inspector determines there is a violation, they can require the property owner to correct the problem.

## Additional Resources

For general information on dampness and mold and a list of local code enforcement agencies, with a focus on dampness and mold, see www.cdph.ca.gov/iaq/mold. To see an animated video series, Mold in the Home, visit www.cdph.ca.gov/mold.

*Property owners must provide a rental unit that is safe and healthy for the people living in it.*

*Tenants must notify property owners of any dampness or mold problems.*

For more information, visit CDPH website (www.cdph.ca.gov/Pages/contact_us.aspx)

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831



# CAL FIRE - OFFICE OF THE STATE FIRE MARSHAL
# INFORMATION BULLETIN 24-001

Issued: January 23, 2024
Updated from IB 23-003

## Lithium-Ion Battery Safety

### BACKGROUND

Lithium-ion rechargeable batteries are commonly used in home electronics such as phones, batteries are small and powerful, but when used incorrectly, they can overheat, catch fire, or explode. Fire agencies across California continue to respond to fires caused by lithium-ion batteries.

### REQUIREMENTS FOR STORAGE OF ELECTRONIC BIKES, SCOOTERS, AND OTHER ELECTRONIC MICROMOBILITY DEVICES IN RENTAL HOUSING

California Civil Code (CIV) Section 1940.41 defines a "Personal micro-mobility device" as device with both of the following characteristics:
(A) It is powered by the physical exertion of the rider or an electric motor.
(B) It is designed to transport one individual, or one adult accompanied by up to three minors.

CIV 1940.41 that takes effect January 1, 2024, the new law affects storage of e-bikes, e-scooters, and other *personal micro-mobility devices* stored in a rental housing unit.  The owner may prohibit the tenant from charging a device in the unit if the device does not meet the standards listed below. It allows for storage and charging of up to one e-bike, e-scooter, or other *personal micro-mobility device* in the rental unit for each person occupying the unit if the device meets one of the following:

A.  Complies with the following safety standards:

For e-bikes, UL 2849, the Standard for Electrical Systems for E-bikes, as recognized by the United States Consumer Product Safety Commission, or EN 15194, the European Standard for electrically powered assisted cycles (EPAC Bicycles).

For e-scooters, UL 2272, the Standard for Electrical Systems for Personal E-Mobility Devices, as recognized by the United States Consumer Product Safety Commission, or EN 17128, the European Standard for personal light electric vehicles (PLEV).

B.  Is insured by the tenant under an insurance policy covering storage of the device within the tenant's dwelling unit.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 117 of 129

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831



# CAL FIRE - OFFICE OF THE STATE FIRE MARSHAL
# INFORMATION BULLETIN 24-001

## SAFETY TIPS

- Purchase and use devices that are listed by standards UL 2849, EN 15194, UL 2272, EN 17128 or a qualified testing laboratory.
- Always follow the manufacturer's instructions.
- Only use the battery that is designed for the device.
- Put batteries in the device the right way.
- Only use the charging cord that came with the device.
- Do not charge a device under your pillow, on your bed, or on a couch.
- Do not keep charging the device or device battery after it is fully charged.
- Plug directly into a wall electrical outlet for charging.
- Keep batteries at room temperature and away from heat or direct sunlight. Do not charge them at temperatures below 32°F (0°C) or above 105°F (40°C).
- Store batteries away from anything that can catch fire.
- Do not charge a device while sleeping.
- Do not charge a device near your primary exit.

## STOP OPERATION OF THE DEVICE OR CHARGING THE BATTERY IF:

- They emit an unusual smell,
- Develop heat,
- Change shape/geometry,
- Behave abnormally, or
- Develop a leak or make an odd noise.

If any of the above happens and you feel in danger, call 9-1-1. If safe, move the device away from anything that can catch fire.

## BATTERY DISPOSAL

- Do not put lithium-ion batteries in the trash.
- Recycling is always the best option.
- Take them to a battery recycling location or contact your community for disposal instructions.
- Do not put discarded batteries in piles.

## FIRE EXTINGUISHER

- Lithium-ion batteries are considered a Class B fire, so a standard ABC or dry chemical fire extinguisher should be used.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 118 of 129

Docusign Envelope ID: E843D6AB-2E5D-42D4-BC6D-7CDD78F19831



# CAL FIRE - OFFICE OF THE STATE FIRE MARSHAL
# INFORMATION BULLETIN 24-001



## Use approved batteries
Only purchase and use devices that have a reputable testing agency mark such as UL. These show that the product has been safety tested.



## Use supplied charger
Follow the manufacturer's instructions for charging and storage. Use the correct cord and power adapter made specifically for the device.



## Use the wall outlet
Always plug directly into a wall electrical outlet for charging.



## Make sure you can get out
Never block your primary way in or out of a room/apartment.



## Store in open space
Batteries should be stored away from anything flammable (ex. pillow, bed, or couch).



## No overnight charging
Do not leave devices unattended while charging or charge them overnight.



## Keep away from heat
Keep batteries and devices at room temperature. Keep away from direct sunlight and any heat source such as a radiator.



## Dispose of batteries safely
Do not place lithium-ion batteries in a trash or recycling bin.



## Use baterías aprobadas
Sólo compre y use dispositivos que tengan una marca de agencia de pruebas acreditada, como UL. Estos muestran que el producto ha sido probado en seguridad.



## Utilice el cargador suministrado
Siga las instrucciones del fabricante para la carga y el almacenamiento. Utilice el cable y el adaptador de corriente correcto fabricado específicamente para el dispositivo.



## Use el tomacorriente de pared
Siempre conecte directamente a un tomacorriente de pared para cargar.



## Asegúrate de poder salir
Nunca bloquee su entrada o salida principal de una habitación/apartamento.



## Almacenar en espacio abierto
Las baterías deben almacenarse lejos de cualquier objeto inflamable (p. ej., almohadas, camas o sofás).



## No Cargar durante la noche
No deje los dispositivos desatendidos mientras se cargan, ni los deje cargando durante la noche.



## Manténgala alejada del calor
Mantenga las baterías y los dispositivos a temperatura ambiente. Mantener alejado de la luz solar directa y de cualquier fuente de calor como un radiador.



## Botar las baterías de forma segura
No coloque las baterías de Iones de Litio en un contenedor de basura o de reciclaje.

Case: 26-01003   Doc# 1   Filed: 02/25/26   Entered: 02/25/26 20:36:54   Page 119 of 129

# EXHIBIT G



# THREE-DAY NOTICE TO PAY RENT IN FULL OR QUIT
## (Code of Civil Procedure section 1161(2))

To:   Kenneth Mattson, Stacy Mattson
      and all Tenants, Subtenants, and Occupants in Possession at:

Address:   3003 Castle Rd
           Sonoma, CA 95476

**PLEASE TAKE NOTICE** that within three (3) days of 01/23/2026, excluding Saturdays, Sundays, and judicial holidays, you are required to pay the rent now due and owing on the premises located at: 3003 Castle Rd, Sonoma, CA 95476, Sonoma County in the amount of **seven thousand nine hundred ninety-nine dollars and 92 cents** ($**7,999.92**), representing the rent due on January 20, 2026.

| MONTH | RENT DUE | PAYMENTS | BALANCE |
|---|---|---|---|
| January 20, 2026 - January 31, 2026 | $7,999.92 | $0.00 | $7,999.92 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  | **TOTAL RENT DUE:** | **$7,999.92** |

Within three (3) days after 01/23/2026, excluding Saturdays, Sundays, and judicial holidays, the total overdue rent payment, in the amount stated above, must be made by personal check or money order made payable to "**KS Mattson Partners, LP**" and delivering the payment to David Carlson, or any employee at PURE Property Management, located at 628 E Washington St, Ste C, Petaluma, CA 94952, 707-524-8380. Payment may be delivered in person Monday through Friday between the hours of 9:00AM to 5:00PM.

In the alternative, you are required to vacate and deliver the Premises to PURE Property Management, agent for Landlord, KS Mattson Partners, LP, within three days,



excluding Saturdays, Sundays, and judicial holidays, after service of this notice upon you.

If you fail either to pay the amount of rent demanded in this notice or to vacate and deliver the premises to KS Mattson Partners, LP within three days, excluding Saturdays, Sundays, and judicial holidays, the undersigned will commence legal proceedings against you to (1) declare a forfeiture of your rental agreement, (2) recover possession of the premises, (3) recover the rent demanded herein, due for the periods covered by this notice, (4) recover daily holdover damages for each day that you occupy the premises after the periods covered by this notice, and (5) recover costs of suit, and any other relief the Court deems appropriate.

Calculating Your Deadline to Comply: This Notice was served on 01/23/2026. To calculate the time you have to comply with this notice:

- **Do not** count the day it was served.
- **The first day you count is the next day** that is not a Saturday, Sunday, or judicial holiday.
- **Continue counting days that are not Saturdays, Sundays, or judicial holidays** until you reach the number of days stated in this Notice.

Dated: 01/23/2026

Signature:_____

Print Name: David Carlson
Agent for Owner

# EXHIBIT H



# THE LAW OFFICES OF
# JAMES L. ARRASMITH

5150 Sunrise Boulevard
Suite G-1
Fair Oaks, CA 95628

📞 916-704-3009
✉ james@jlegal.org

January 29, 2026

*Sent Via Email and Certified Mail*

PURE Property Management
Attn: David Carlson
628 E. Washington Street, Suite C
Petaluma, CA 94952
Email: dcarlson@rentpure.com

**RE: Kenneth Mattson and Stacy Mattson, 3003 Castle Road, Sonoma, California**
**Invalid Rent Increase, Defective Three-Day Notice, and Demand for Cure and Negotiated Resolution**

Dear Mr. Carlson:

This firm represents Kenneth Mattson and Stacy Mattson with respect to their tenancy and possession of the real property located at 3003 Castle Road, Sonoma, California 95476.

This correspondence is directed to PURE Property Management as the issuing party of the December 17, 2025 30-day notice of change in terms of tenancy and the January 23, 2026 Three-Day Notice to Pay Rent or Quit. Bankruptcy counsel and the estate administrator are copied for notice only due to the Chapter 11 status of the landlord entity.

Withdraw the defective notices immediately and confirm in writing that no unlawful detainer action will be filed based on them. This letter constitutes formal notice of statutory violations and a final opportunity to resolve this matter without immediate litigation.

### Invalid Rent Increase and Void Three-Day Notice

On December 17, 2025, your office purported to serve the Mattsons with a 30-day notice of change in terms of tenancy attempting to impose a rent obligation of $20,000 per month, purportedly effective January 20, 2026. That notice is legally defective and unenforceable for multiple independent reasons, including but not limited to the following:

1. **No lawful cash rent baseline existed.** The Mattsons have occupied the property under a long-standing caretaker arrangement, known to and acquiesced in by the bankruptcy trustee, pursuant to which their full-time maintenance and fire mitigation services constituted lawful non-monetary rent in lieu of cash payment. The value of those services is approximately $80,000 annually, equivalent to the salary of the paid caretaker whom the Mattsons replaced in 2023. The attempted imposition of a $20,000 monthly monetary obligation therefore constitutes a rent increase from an established non-cash rent baseline, not the creation of a new tenancy, and could not be imposed without strict compliance with California Civil Code section 827, including the ninety-day notice requirement applicable to increases exceeding ten percent of the rent charged during the preceding twelve months. Such conduct further

violates California Civil Code section 1942.5, which prohibits retaliatory and coercive eviction practices following the tenant's exercise of protected rights.

2. **The proposed rent increase is unreasonable and imposed in bad faith and was calculated to coerce vacancy rather than to establish lawful rent.** A unilateral demand for $20,000 per month far exceeds fair market rent for comparable properties, which is approximately $7,500 to $10,000 per month. The demand also presumes continued full-time caretaker services with a fair market value exceeding $6,600 per month, without compensation. The timing and structure of the demand, following the Bankruptcy Court's refusal to authorize removal, confirm that the notice was issued to coerce vacancy rather than to establish lawful rent. Such conduct is improper and supports all available statutory and equitable defenses, including defenses grounded in unlawful notice practices and retaliatory eviction principles.

3. **The notice is misleading and legally ineffective.** The notice is titled "Notice of Change of Terms of Tenancy (Except Changes in Monthly Rent)", yet the sole substantive change it purports to impose is a new rent obligation. California Civil Code section 827 governs changes to tenancy terms, including rent increases, and requires notice sufficient to clearly inform the tenant of the nature and effect of the proposed modification. A notice that expressly disclaims any change in rent while imposing one is misleading, fails to provide lawful notice, and is unenforceable. A notice that affirmatively misstates its legal effect fails to satisfy the clarity and notice requirements of California Civil Code section 827.

4. **The Mattsons never accepted the proposed terms.** They did not sign the attached month-to-month rental agreement, did not agree to pay $20,000 per month, and their continued occupancy does not constitute acceptance of unilateral, unaccepted terms or create an enforceable rent obligation.

Because the rent-demand foundation is defective, no rent is currently due and owing within the meaning of Code of Civil Procedure section 1161(2). The January 23, 2026 Three-Day Notice to Pay Rent or Quit demands a prorated amount derived exclusively from the unaccepted and invalid $20,000 rent term. It therefore demands rent not due under any enforceable agreement and is void as a matter of law.

### Bankruptcy Context

As you are aware, KS Mattson Partners, LP is a debtor in an active Chapter 11 proceeding (Case No. 24-10454 CN, United States Bankruptcy Court for the Northern District of California, Santa Rosa Division). The Bankruptcy Court previously declined to authorize the Mattsons' removal and directed that any effort to recover possession proceed, if at all, through ordinary state law unlawful detainer procedures. Attempts to manufacture a default through defective notices expose the estate and its agents to unnecessary litigation risk, expense, and potential sanctions.

### Preservation Demand

Preserve all documents and communications relating to the rent change, the drafting, service, and enforcement of the December 17, 2025 notice and the January 23, 2026 Three-Day Notice, and any instruction or authorization from the trustee, estate representatives, or counsel.

### Demand and Proposal for Resolution

The Mattsons do not seek permanent possession of the property. They seek a reasonable, lawful, and transitional resolution that recognizes the substantial and ongoing value of their caretaker services, the extreme fire risk and maintenance burden associated with the property's location in a designated high fire hazard zone, the significant liability and catastrophic loss exposure vacancy would create for the estate, and the

impracticality and cost of immediate vacancy. Mr. Mattson's active Chapter 7 bankruptcy further necessitates an orderly transition.

Accordingly, the Mattsons hereby demand the following:

1. **Immediate rescission and withdrawal** of the December 17, 2025 30-day notice and the January 23, 2026 Three-Day Notice.
2. **Written confirmation** that no unlawful detainer action will be filed based on those notices.
3. **Good-faith negotiations** for one of the following resolutions:
   o A written transitional occupancy agreement of no less than ninety days, with a defined cash component expressly offset by caretaker-service credits, mutual releases, and no unlawful detainer filing; or
   o A negotiated voluntary move-out timeline of no less than 90 days, with mutual releases and no adverse reporting, in lieu of litigation.

### Deadline

If we do not receive written confirmation of withdrawal of the defective notices and an agreement to negotiate within 14 days of the date of this letter, our office is prepared to initiate litigation without further notice, including appropriate proceedings in Superior Court and the Bankruptcy Court.

Nothing herein constitutes a waiver of any rights, remedies, or defenses, all of which are expressly reserved.

Sincerely,

*James L. Arrasmith*

**James L. Arrasmith, Esq.**
Owner and Chief Legal Counsel
Attorney for Kenneth Mattson and Stacy Mattson

cc:

Hogan Lovells US LLP
Richard L. Wynne, Esq.
Edward J. McNeilly, Esq.
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
richard.wynne@hoganlovells.com; edward.mcneilly@hoganlovells.com

Stapleton Group
Robbin Itkin
514 Via De La Valle, Suite 210
Solana Beach, CA 92075
info@stapletoninc.com

# EXHIBIT I

## 60-DAY NOTICE OF TERMINATION OF TENANCY

To Tenant: **Kenneth Mattson, Stacy Mattson**
and all tenants, subtenants, and occupants in possession

At Address: **3003 Castle Rd**
**Sonoma, CA 95476**

**PLEASE TAKE NOTICE** that your month-to-month tenancy is terminated as of **April 3, 2026** or **60-DAYS** from the date this notice is served on you, whichever is later. On that date you are required to vacate and deliver possession of the premises to PURE Property Management, Agent for Landlord at the below checked office location:

- [ ] 1101 College Ave, Ste 140, Santa Rosa, CA 95404
- [X] 628 E Washington St, Ste C, Petaluma, CA 94952
- [ ] 390 W Standley St, Ukiah, CA 95482
- [ ] 1793 Union St, Ste B, San Francisco, CA 94123

Keys must be delivered during normal business hours, Monday – Friday 9:00am – 5:00pm, major holidays excepted.

**THIS NOTICE** is intended to terminate the tenancy that has entitled you to possession of the above-mentioned premises. If you do not move out, then Landlord intends to initiate legal proceedings to recover possession of the premises, to declare said rental agreement forfeited, and to recover rents and damages for the period of the unlawful retention. Tenant may shorten a 60-day notice by delivering to Lessor a minimum 30-Day Notice to Vacate. Failing receipt of such response, tenant is responsible for rent through the notice period referenced above. **Rent continues to be due through the end of the notice period**. Possession of property will be considered relinquished once keys and/or all other means of access are delivered to the Agent for Landlord.

Pursuant to California Civil Code Section 1950.5, you have the right to request that a Housing Provider or Housing Provider's agent make an inspection of the Premises prior to the termination of your tenancy for the purpose of giving you an opportunity to remedy deficiencies (consistent with your lease or rental agreement), in order to avoid certain deductions from your security deposit. You have the right to be present at this inspection. If you are not present, the inspection may proceed without you. The inspection can be conducted no earlier than two weeks prior to the termination of your tenancy. The inspection must be conducted during normal business hours. **If you want an inspection prior to the termination of your tenancy, you must request one in writing from your Property Manager**. If you do not request an inspection in writing, then we will presume you do not want an inspection prior to the termination of your tenancy.

State law permits former tenants to reclaim abandoned personal property left at the former address of the tenant, subject to certain conditions. You may or may not be able to reclaim property without incurring additional costs, depending on the cost of storing the property and the length of time before it is reclaimed. In general, these costs will be lower the sooner you contact your former landlord after being notified that property belonging to you was left behind after you moved out.

This Notice is being served in Good Faith and Honest Intent pursuant to California Civil Code, Section 1946.

Dated: 02/02/2026

**David Carlson**
PURE Property Management
1101 College Avenue Suite # 140
Santa Rosa, CA 95404
707-524-8380